IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

PEDRO GARCIA ARRIAGA, and        (      3:12-CV-00094-D
all others similarly situated (
under 29 U.S.C. § 216(B)         (
                                (
            Plaintiff,           (
                                (
                                (
VERSUS                          (       DALLAS, TEXAS
                                (
                                (
CALIFCO, LLC, et al.,            (
            Defendants.          (      AUGUST 19, 2013

TRANSCRIPT OF BENCH TRIAL

BEFORE THE HONORABLE SIDNEY A. FITZWATER,

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:


FOR THE PLAINTIFF:  JAMIE HARRISON ZIDELL
                    J H Zidell PC
                    6310 LBJ Freeway, Suite 112
                    Dallas, TX 75240
                    972/233-2264
                    Email: zabogado@aol.com


                    ROBERT LEE MANTEUFFEL
                    J H Zidell PC
                    6310 LBJ Freeway
                    Suite 112
                    Dallas, TX 75240
                    972/233-2264
                    Email: rlmanteuffel@sbcglobal.net

```
FOR THE DEFENDANT:    TOM A. CARSE
                      Carse Law Firm
                      6220 Campbell Rd
                      Building 4 Suite 401
                      Dallas, TX 75248
                      972/503-6338
                      Email: tom@carselaw.com




COURT REPORTER:              PAMELA J. WILSON, RMR, CRR
                             1100 Commerce Street, Room 1535
                             Dallas, Texas 75242
                             214.662.1557
                             pam_wilson@txnd.uscourts.gov


     Proceedings reported by mechanical stenography,

transcript produced by computer.
```

BENCH TRIAL - AUGUST 19, 2013

**P R O C E E D I N G S**

THE SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

Good morning counsel and litigants.

The matter before the court is Arriaga versus Jess Enterprises, LLC and others.

I've been advised by the court reporter of a need of counsel to address the court before jury selection begins, and I note that we have Mr. Zidell and Mr. Manteuffel present.

Mr. Carse.

MR. CARSE:  Good morning, Your Honor.

I -- also for the court our corporate representative, Albino Villenueva is clearing security.

THE COURT:  All right.  And who wishes to speak to the court at this time?

MR. CARSE:  I do, Your Honor.

THE COURT:  Mr. Carse.  If you would approach the lectern.

MR. CARSE:  Good morning.

May it please the court.  Late last night I was advised by Mr. Elias Shokrian that on behalf of all defendants my representation was terminated immediately and that he further instructed me to inform the court of that termination and to also request a continuance to permit the defendants time to

retain new counsel.  And I'm doing as instructed.

And as soon as I received that information from Mr. Shokrian I contacted my client contact to so inform him of that.  And I -- I expect him in the courtroom at any minute, in case the -- the court has any questions of him concerning this development.  It's untimely, and I wanted to bring it to the court's attention just as soon as practicable, just as soon as I was aware of it.

THE COURT:  Okay.  Well, there are four defendants, three of whom cannot appear pro se.

MR. CARSE:  Yes.

THE COURT:  And so we're looking at a default judgment against those three.

Do you think your client understands that if I don't grant a continuance?

MR. CARSE:  I don't think he does.

But I would defer to the corporate representative.

THE COURT:  Who may have entered the courtroom.

Do you want to take a moment to confer privately with him?

MR. CARSE:  If I may.

THE COURT:  You may.

(Pause.)

MR. CARSE:  Your Honor, this is Albino Villenueva, corporate representative for the three corporate

representatives.

If you would, sir, have a seat in the middle there.

The corporate representative has been so advised, Your Honor, of the -- of the potential of a default.  He does not know what Mr. Shokrian does or does not want to do.

I would request the court's indulgence to allow Mr. Albino Villenueva to step out in the hallway, use my telephone to contact Mr. Shokrian so we can so advise him of the potential consequence.

THE COURT:  I will allow him to do that.

What I do want to do is find out the plaintiff's position on this matter.

MR. CARSE:  I'll be seated.

THE COURT:  And then --

MR. ZIDELL:  My name is Jay Zidell and I represent the plaintiff along with Mr. Manteuffel.  Good morning.

THE COURT:  Proceed.

MR. ZIDELL:  Yes, judge, we would oppose the motion for continuance.  We just found out about it at the same time the court did this morning.  We're prepared.  We have our witnesses ready to go.  And we haven't seen any formal motion filed or anything sent -- signed by -- by any of the defendants.  As much as I sympathize with Mr. Carse, under these particular circumstances we would oppose a continuance.

THE COURT:  All right.  Thank you.

Mr. Carse, I'm going to deny any continuance, and so if that information helps you in talking with Mr. Shokrian, then you certainly may share that.  And I want to put this on the record, so that this -- the record will be complete.

And you may be seated, Mr. Carse, if you like, and then we'll proceed accordingly.

The court has not been given any cause for continuing the case other than the termination of counsel and has no basis for concluding that the termination of counsel has any valid reason, other than the whim or caprice of the client, and a defendant -- no matter can avoid a day in court simply by terminating its counsel at the last minute.

The plaintiff is ready to proceed to trial.  I have prepared for trial.  As counsel know, we had a pretrial conference on this case last Wednesday.  I've prepared in drafting the charge and all of the documentation that goes with the trial of a case.

Additionally, we have a jury panel downstairs and ready to be brought upstairs for jury selection.

And moreover, the -- the court system just does not have time to give up a -- a week because at the last minute a client decides to fire or terminate counsel.  And I -- this is a case I need to try now.  I have a very busy fall.  I think I mentioned at the pretrial conference, if not I intended to, that I'm starting a multiweek criminal case next Monday.  I

need to try this case this week.  It's not like I can move it back.  So I'm going to deny the continuance.

And if you like, it will take us a few minutes to get the panel up here, you -- you can step outside, have the representative advise Mr. Shokrian that under the well-settled law of this circuit the -- three of the four defendants would have default judgments entered against them and the court would simply as to those three be determining the amount of unpaid overtime, but the default would default as to liability, it would default as to willfulness, it would default as to attorney's fees, and the trial of the case would be limited to Elias Shokrian, also known as Elias Shakrian.

So that's -- that's what I -- that's the status of the case as it stands, Mr. Carse -- excuse me -- Mr. Carse.

MR. CARSE:  Thank you, Your Honor.

THE COURT:  All right.  I would like to avoid undo delay.  Do you have an idea of how long you will need?

I think our panel is ready downstairs.

Is that correct?

THE SECURITY OFFICER:  Yes.

THE COURT:  So it would probably be, you know, 15 or 20 minutes.

MR. CARSE:  I don't need any more time than that.

THE COURT:  Okay.  Then what I'd like you to do -- the other thing I should mention is if you have been

terminated -- I'm assuming you lack any authority to represent Mr. Shokrian individually.  Because he is a natural person he would be entitled to be here pro se, but there was some discussion of his being unavailable today.  So there -- and there's no reason to delay the case past today, so we could be in a default situation as to him not based on his status as a pro se or not but based on his failure to appear for trial.

MR. CARSE:  And on that note, Mr. Shokrian also advised me that not only is he in mediation all day today, he is in the 168th Judicial District Court of Dallas County on Tuesday morning, of which I had no knowledge of or otherwise had I had knowledge of I would have advised the court during our -- our conference call for the pretrial.  So the chips are apparently going to fall where they may, Your Honor.

THE COURT:  What I'm going to do, in these circumstances, is have the jury panel stay downstairs, because there's no need for a jury trial if we end up with just a default prove-up today.

So what I'm going to do is -- let me ask my courtroom deputy to come forward for a minute, just get the logistics in mind.

And you may have a seat, Mr. Carse.  Thank you.

MR. CARSE:  Thank you.

(Pause.)

THE COURT:  Mr. Carse, do you think that if I

directed that we reconvene at 9:15, which is a little more than 15 minutes from now, that would give you sufficient time?

And if there's not, then you could send word and I would give you some reasonable extension?

MR. CARSE:  All right.  I'll work around those -- around those parameters.

THE COURT:  All right.  My plan at this point is to reconvene at 9:15 and find out where we stand.  And at that point it's probable we're either going to direct that the -- for example, if he rehires you again, we're going to bring the panel back up; and if not, then I'll find out where we are as far as his appearance.

MR. CARSE:  Fair enough.

THE COURT:  Okay.  Now, I guess I should ask plaintiff's counsel, if we do not have Mr. Shokrian as a witness if there's a problem with that, is that a problem for your case in chief or is that more a problem for the defendants?

MR. ZIDELL:  It would be a problem for our case in chief, Your Honor.  It -- it would.

THE COURT:  And I'm trying to remember.  Did you take his deposition or . . .

MR. ZIDELL:  We did not, Your Honor.

THE COURT:  Okay.  Well, it could be if he is not reasonably available, if there are some factual matters

that -- that you need established I may look at that as some sort of sanction, that his not being here may serve as basis for their admitting certain facts.  I'll have to look at my authority and see what kind of facts you'd be talking about.

MR. ZIDELL:  Yes, sir.

THE COURT:  So that's something to communicate to him, that his being here -- his failure to be here tomorrow, which is the day we talked about at the pretrial conference, could also subject the -- he certainly, but -- subject him certainly, but possibly the other defendants - I'd have to consider my authority and whether that would apply to the other defendants - to admissions.

MR. CARSE:  I understand the court.

THE COURT:  All right.  At this time then we'll stand in recess until 9:15.

THE SECURITY OFFICER:  All rise.

(Recess taken at 9:00.)

(Proceedings resumed at 9:10.)

THE SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

Mr. Carse, you may approach the lectern --

MR. CARSE:  Thank you, Your Honor.

THE COURT:  -- and advise the court of the status of your conversation.

MR. CARSE:  May it please the court.

As instructed by the court I took the -- the 15 -- the past 15 minutes to visit with the corporate representative for the corporate defendants, who in turn communicated the following to Mr. Shokrian, that the continuance has been denied, that the court will be entering three default judgments against the defendants and find for -- for the plaintiff on the issues of liability, willfulness, excuse me, and take up the issue on attorney's fees.

And lastly, that Mr. Shokrian is expected to be in the courtroom tomorrow morning at 9:00 a.m.  Failure to attend could subject Mr. Shokrian to monetary sanctions and possibly the other defendants, depending on -- depending on certain factors.

I communicated that to Mr. Villenueva who in turn communicated that to Mr. Shokrian.  I was not a party to that conversation.

Mr. Villenueva would like to address the court so that he can accurately explain to the court what Mr. Shokrian's response was to each of these three matters.  If he may be permitted.

THE COURT:  He may.

And I want the record to be clear that the context regarding Mr. Shokrian and his presence was with respect to whether the trial went on.

If the court denies the continuance, which -- which it

has, then I'm not going to wait until tomorrow to do anything, I'm going to proceed today. I just want that to be clear.

MR. CARSE: All right. What was communicated and what I -- what the court communicated to me was what I understood to be for tomorrow, not for today. I know he's not going to be here today and I -- and I've known that.

THE COURT: All right.

MR. CARSE: So I don't want any misunderstanding there. And Mr. Villenueva has known that, that he would not be here, not be present today.

THE COURT: All right. If -- if Mr. Villenueva wishes to address the court, he may.

THE WITNESS (Through interpreter): I talked with Mr. Elias Shokrian. I let him know that he needed to be here today. He said he could not be here today. He can't be here until tomorrow.

And I let him know what the attorney had explained to me as -- as far as the punishment -- what is the word? He understood as far as the consequences of his not being here today. And he said that was okay.

THE COURT: Mr. Carse, do you have any objection if I ask Mr. Villenueva whether you have been terminated?

MR. CARSE: No objection, Your Honor.

THE COURT: Mr. Villenueva, do you know whether Mr. Carse has been terminated as the attorney for all of the

defendants?

THE WITNESS (Through interpreter):  Yes.  Last night I had to make a call to Mr. Elias Shokrian and he had confirmed to me that he had let the attorney go.

THE COURT:  Is there anything else you would like to say, Mr. Villenueva?

THE WITNESS (Through interpreter):  That's all for now.

THE COURT:  All right.  Thank you, sir.

THE WITNESS (Through interpreter):  Thank you.

MR. CARSE:  Your Honor, I have one follow-up, if I may.

THE COURT:  You may proceed, Mr. Carse.

MR. CARSE:  I didn't hear Mr. Villenueva address the three default judgments against the three corporate entities, and I just wanted to make sure that if the court has a question for Mr. Villenueva about that and his conversation with Mr. Shokrian on that topic that that be cleared up, if the court has any question about it at all.  I understood that he did have that conversation with him and Mr. Shokrian had a response, but that was a conversation not between myself and Mr. Shokrian but Mr. Villenueva and Mr. Shokrian.

THE COURT:  All right.  So there would be no attorney/client privilege protecting that conversation?

MR. CARSE:  That is correct.

THE COURT:  All right.  Well, Mr. Villenueva, would you mind coming forward?

MR. CARSE:  Come up, please.

THE COURT:  Mr. Villenueva, did you communicate with Mr. Shokrian that it -- that the court had said that there were three defendants, Jess Enterprises, SEJ Properties, and Califco, as to whom default judgments would be entered if they did not have lawyer to represent them at the trial?

THE WITNESS (Through interpreter):  No, sir.

THE COURT:  Okay.  Mr. Carse, if -- if you would like to develop the record.

MR. CARSE:  Sure.

Mr. Villenueva, did you communicate to Mr. Shokrian that the court was prepared to enter default judgments against the defendant companies because the court had denied the motion for continuance?

THE WITNESS (Through interpreter):  Yes, I told him that.

MR. CARSE:  And what did Mr. Shokrian say to you in response to?

THE WITNESS (Through interpreter):  That the court could proceed the way the court felt best and to continue on.

MR. CARSE:  Nothing further.

THE COURT:  All right.  Thank you.

THE WITNESS (Through interpreter):  I'm sorry.

MR. CARSE:  May we be excused from the lectern?

THE COURT:  You are.

MR. CARSE:  Thank you.

THE COURT:  The court has denied the motion for continuance.  There are three defendants who are not natural persons.  It is settled under the law of the circuit that they cannot represent themselves pro se.

The individual, Mr. Shokrian, who can appear pro se, is not present, and I have been advised does not intend to be present until tomorrow.  There is, however, no good reason under the circumstances of this case to delay this proceeding until tomorrow for him to be present.

This termination of counsel occurred literally at the eleventh hour, after the pretrial conference, after the court and the parties had prepared for trial.  The court understands that the plaintiff is present and ready to proceed; and therefore, unless it would prejudice the plaintiff for me to proceed, it's my intention to proceed.

Mr. -- the way we would proceed, there would not be a default as such as to Mr. Shokrian, but he would not be present to cross-examine witnesses, so we would just hear the witnesses in order.

Again, I'll ask Mr. Zidell, is this something where the plaintiff would be prejudiced by my proceeding?

MR. ZIDELL:  Your Honor, last week when we had the

pretrial conference we had agreed for Mr. Shokrian to appear tomorrow, but with the understanding that we would have a full trial day today.

We need Mr. Shokrian's testimony, I believe, to establish thoroughly his individual liability under the FLSA, so I believe that we would be prejudiced under these particular circumstances if we had to proceed today with Mr. Shokrian's testimony, him not being present to testify.

THE COURT:   What if he does not appear tomorrow?

MR. ZIDELL:   Then --

THE COURT:   What I'm thinking about is whether to go ahead and select a jury today.   Essentially it would be without his participation.

MR. ZIDELL:   Well, would the court entertain perhaps -- and I would have to speak to -- to our client about that, but waiving a jury trial under these circumstances and perhaps the court would accept an affidavit from the plaintiff as to his damages within a time certain, along with all other post-trial motions, and perhaps that would be the most efficient way to handle that part.   I believe that the plaintiff would be in agreement just to waive a jury trial.   I don't think that we need to encumber the jury or the court's time under -- just for that purpose.

THE COURT:   What I'm concerned about is Mr. Shokrian waiving a jury trial.   And I don't want to incur the

expense -- we -- we don't have money in the federal government or the court system to waste right now.

MR. ZIDELL:  Okay.

THE COURT:  And I would be paying all of these jurors to come back a second day --

MR. ZIDELL:  Right.

THE COURT:  -- an entire panel.

So I -- I don't see a reason to delay jury selection if we're going to have a jury.

Is there something in particular that you feel you can't prove -- and you don't have to reveal it to me, I'm just -- what I'm trying to do is get a sense of whether -- obviously he's not going to be here to cross-examine, there are not going to be objections to the admissibility of evidence.

If you -- if you had an affidavit or something, there's no one to object that it's hearsay.

I'm just wondering from a practical standpoint whether --

MR. ZIDELL:  We'll do the best that we can, judge. That's fine.  We can go forward just against Mr. Shokrian and -- as the court -- as the court wishes.

THE COURT:  Actually, your proof would -- would apply to the defendants, it's just that they would have defaults to them and I would use the -- the proof in making my findings as to them.

MR. ZIDELL:  Sure.

What we would need is to probably speed up the second witness of the day, who is the bookkeeper for the defendants, and trying to accommodate her schedule I believe that Mr. -- I told Mr. Carse she didn't have to appear until after the first break, but I think that in light of the posture of the case she needs to come down right away, just so we don't have any lapse of time whatsoever.  If that's okay with the court.

THE COURT:  Well, it certainly would be.

MR. ZIDELL:  Okay.  So if Mr. Carse could call her.

THE COURT:  Let me, if I might, get my list of the witnesses I had from the pretrial conference and get an idea of who the witnesses would still need to be.

We had Mr. Arriaga.

Do you still need Mr. Villenueva?

MR. ZIDELL:  Yes.  Yes, we would.

THE COURT:  Okay.  And since he's here, could you take him out of order?

MR. ZIDELL:  Sure.

THE COURT:  And then we have Mrs. Daniel Jonathan Cano-Aguillon, is that the person you needed?

MR. ZIDELL:  Yes.

THE COURT:  And Mr. Carse has been in communication with her?

MR. CARSE:  I have, Your Honor, and she's expecting a phone call.

THE COURT:  Okay.  And then I had Mr. Raul Rodriguez, Mr. Alejandro Benitez Lemo and Mr. Carlos Bonilla.

MR. ZIDELL:  I don't believe that we would call any of those witnesses under these circumstances.

THE COURT:  All right.

MR. ZIDELL:  So it would just be Mr. Villenueva, the bookkeeper, Mrs. Cano, and the plaintiff.  That's it.

THE COURT:  All right.  From a logistical standpoint if we were to recess until 10:00 would that give you some time to gather your thoughts and put together your case?

MR. ZIDELL:  Sure.

THE COURT:  Or do you need a little more time?

MR. ZIDELL:  No.  That will be fine, judge.

THE COURT:  Okay.  And then, Mr. Carse, you're about to be excused from the proceeding, but are you in a position to make that communication to the secretary we mentioned?

MR. CARSE:  Absolutely.  We'll step out in the hall and alert her that she needs to be back here immediately.

THE COURT:  All right.  And Mr. Villenueva understands that he would need to be here until he's testified and then he would be excused?

MR. CARSE:  He does.

THE COURT:  All right.  And you think if we reconvene at 10:00 o'clock that we can proceed with the first witness?

MR. ZIDELL:  Sure.

THE COURT:  All right.  Then the -- the court has determined that a continuance should be denied as to all defendants.

The three defendants who are not a natural person cannot appear pro se and therefore defaults are entered as to those three.

The court declines to continue the trial of the case until tomorrow unless the plaintiff during the development of its case today feels that it is -- he is being prejudiced, in which case I will reconsider that.

But under the circumstances here where the trial of the case was set several months ago, and Mr. Shokrian clearly has known of the necessity that he be present to defend himself if he was going to terminate his lawyer, I'm not going to continue the case past 10:00 o'clock, unless, as I indicated, it prejudices the plaintiff.

At this time then the court will stand in recess until 10:00 o'clock.

Mr. Carse, you're excused at this time, having been discharged.

THE SECURITY OFFICER:  All rise.

(Recess taken at 9:35.)

(Proceedings resumed at 10:00.)

THE SECURITY OFFICER:  All rise.

The United States District Court for the Northern District of Texas is now in session, the Honorable Sidney A. Fitzwater presiding.

Let us pray:  God save the United States and this Honorable Court.

THE COURT:  Be seated, please.

The matter before the court is Pedro Garcia Arriaga versus Jess Enterprises, LLC.

The court is going to put something on the record regarding the matter of a jury so that the record is clear in light of the prior discussion that I had before Mr. Carse was excused from the courtroom.

The plaintiff made a jury demand when he filed his complaint on January 11, 2012.  A jury panel was present this morning and ready to proceed.  But the plaintiff can waive his jury demand.

Mr. Shokrian is entitled to appear pro se and to a jury trial, but Mr. Shokrian cannot be here today.  Although he was excused from the trial today, this was on the assumption that the trial would commence today without him.  He cannot effectively delay the trial for his own purposes by terminating the attorney for all defendants and relying on being excused from trial today.

It would be impossible to fairly select a jury today without Mr. Shokrian's participation, and I don't want to

waste the cost of the panel summoned today when the only purpose would be to accommodate Mr. Shokrian's decision to terminate the attorney for the defendants at the eleventh hour and for no apparent good reason.

Moreover, if this were not sufficient reason to decline to defer jury selection until Tuesday, I was also advised during the proceeding this morning that Mr. Shokrian can't be here Tuesday either.

So I have indicated on the record and will state again that provided the plaintiff is not prejudiced, I will accept his waiver of a jury trial, I will conclude that a jury has been waived by Mr. Shokrian based on his failure to appear today for trial as scheduled, and I will proceed with a nonjury trial of the plaintiff's actions against all four defendants.

Mr. Zidell, is it the plaintiff's desire to waive a jury at this time?

MR. ZIDELL:  Yes, sir.

THE COURT:  All right.  And you may call your first witness, or if you want to make a brief opening statement you may.

MR. ZIDELL:  Just one question.  Is this going to be a trial on damages as well as individual liability for Mr. Shokrian or just the latter?

THE COURT:  I actually was going to conduct the

entire trial at this time, with the exception of attorney's fees, which would be submitted by -- on the papers.

MR. ZIDELL:  Sure.

And also as far as damages are concerned there -- there is no statute of limitations pled as an affirmative defense in this case at all.  There are no affirmative defenses pled by the defendants.  Would that mean that the court would entertain the plaintiff giving testimony going back to 2005 when he first started working for the defendant?

THE COURT:  If you want to go ahead and put that on the record, and if I have a -- a question about recoverability I can ask for some sort of submission but you've gone ahead and put it on the record.

MR. ZIDELL:  Sure.  I wanted -- just in full disclosure, we have disclosed a three-year case from the beginning in this, in our initial disclosures and interrogatory answers, but at the same time I want to protect the plaintiff's rights as much as possible under these circumstances, and there was no affirmative defense ever pled as to statute of limitations.  So that's my -- that's my concern.  That's all.

THE COURT:  What -- what I would do is go ahead and place that testimony on the record.  I -- because I have entered the pretrial order I'll -- I'll look at whether the pretrial order governs it.  I'm trying to remember whether it

was in the pretrial order or somewhere else where I saw that you were essentially saying it's either two years or three years.

MR. ZIDELL:  Probably.  Yeah.  Yeah.  I think that -- where was that?

I believe that was in our plaintiff's statement of the case in the joint pretrial order.

THE COURT:  Yes.  I see that, on page 1.

You can put the testimony on the record, I -- however, because the pretrial order has been entered, I think it likely that -- and because willfulness I suspect is going to be established in this default situation, you're probably looking at three years.

MR. ZIDELL:  Okay.  Sure.

Thank you, judge.

We would call Mr. Albino Villenueva as our first witness.

THE COURT:  All right.  Mr. Villenueva, if you would approach the witness stand at this time.

Raise your right hand to be sworn.

(Witness sworn.)

THE COURT:  All right.  Be seated, please.

The record will reflect that we have an interpreter.

Mr. Zidell, because you've arranged for the interpreter I'm assuming that there's no need to establish the competence of the interpreter on the record?

MR. ZIDELL:  No, judge.

THE COURT:  All right.

MR. ZIDELL:  That's correct.

THE COURT:  And if the interpreter would like to pull the microphone down where you can speak into it.

INTERPRETER QUILLIAN:  Yes, sir.

THE COURT:  Thank you.

You may proceed, sir.

And I think, Mr. Zidell, your microphone was bent a little.

MR. ZIDELL:  Yes, sir.

DIRECT EXAMINATION

BY MR. ZIDELL:

Q.    Mr. Villenueva, can you tell the court where you are from?

A.    (Through Interpreter):  I am originally from Mexico.

Q.    And how old are you?

A.    (Through Interpreter):  42 years old.

Q.    And what is your level of education?

A.    (Through Interpreter):  Up through the 10th grade.

Q.    Okay.  And in this case is it true that you appeared as the 30(b) corporate representative for all of the defendant companies named in this action?

A.    (Through Interpreter):  In this case, yes.

Q.    Okay.  And you testified in order -- as the

representative of all of those companies, correct?

A.    (Through Interpreter):  Yes.

Q.    All right.  Now, is it -- can you tell the -- the court when you first started working -- I'm sorry?

Did the witness have a question?

A.    (Through Interpreter):  No.

INTERPRETER QUILLIAN:  No.  The interpreter is just interpreting simultaneously.

BY MR. ZIDELL:

Q.    Okay.  Can you tell the court when you first started working for the defendant companies in this case?

A.    (Through Interpreter):  2004.  In September.

Q.    And what were you hired to do at the time that -- that you began working there?

A.    (Through Interpreter):  A general maintenance.

Q.    And how long was it before you were promoted to the position of supervisor or maintenance chief?

A.    (Through Interpreter):  Around two years.

Q.    All right.  And can you tell me how many properties -- well, what year would that have been that you became the maintenance supervisor there?

A.    (Through Interpreter):  2007.

Q.    All right.  And are you currently holding that full-time position with the defendants as we sit here today?

A.    (Through Interpreter):  Yes.

Q.   All right.  Can you tell the court during that time period, from the time that you've been the supervisor of the maintenance crews, about how many employees you have supervised on any given basis for that time period.

A.   (Through Interpreter):  Are you asking how many employees have been hired and then left up to this point or how many have left?

Q.   Well, at any given time how many employees are you in charge of as the maintenance supervisor for these defendants?

A.   (Through Interpreter):  Six.

Q.   Okay.  And was Mr. -- was Mr. Arriaga one of those individuals that you supervised while he worked for the defendants?

A.   (Through interpreter):  Yes.

Q.   All right.  Now, is it fair to say that you -- that you acknowledge the fact that Mr. Elias Shokrian is your employer?

A.   (Through Interpreter):  Yes.

Q.   All right.  And he's always been your employer ever since you started working for these companies, right?

A.   (Through Interpreter):  Well, I've understood that he has been the owner of, well, these companies but then at the same time the manager of the properties.

Q.   Okay.  But you do acknowledge the fact that he's been your employer for all of these years, correct?

A.   (Through interpreter):  Yes.

Q.    Okay.  And is it -- is it also fair to say that -- that you directly reported to Elias Shokrian as your employer for all of these years?

A.    (Through Interpreter):  To report directly to him, no, not directly to him.

Q.    Do you work for him directly?

A.    (Through Interpreter):  Yes, he's my boss.

Q.    Okay.  And has Elias Shokrian ever come to Dallas regarding his work and the work that you do for him?

A.    (Through Interpreter):  Yes.

Q.    Can you tell the court what you -- you've spoken to him about work, is that fair to say?

A.    (Through Interpreter):  Lately, yes, but before that it was about the managers of the properties.  Before that I really didn't have much communication with him.

Q.    Okay.  Do you remember when you were actually deposed in this case, where you swore to give your testimony as truthful testimony?

A.    (Through Interpreter):  No.

Q.    On December 21st, 2012?

A.    (Through Interpreter):  Oh, okay.  Yes, I remember, but the date I don't remember.

Q.    Okay.  But you do remember taking an oath before you gave that testimony?

A.    (Through Interpreter):  Yes.

Q.    Okay.  At page 28, and I'm just asking you if you remember this question and answer right now, page 28, at line 18, referring to Mr. Shokrian, the question is:

        "Q.   What has he talked to you about?"

    And your answer was:

        "A.   Work."

    Do you remember that?

A.    (Through Interpreter):  Yes.

Q.    And is that your same answer today?

A.    (Through Interpreter):  Yes.

Q.    Okay.  And he spoke to you about different projects that you were handling for him on the maintenance side, right?

A.    (Through Interpreter):  Yes.

Q.    And he explained to you what needed to be done at those different projects and shopping centers, right?

A.    (Through Interpreter):  Yes.

Q.    And he explained to you by when the work needed to be accomplished, correct?

A.    (Through Interpreter):  Yes.

Q.    And he also explained to you what the budget was for those projects in the different shopping centers that you handled for him, right?

A.    (Through Interpreter):  As far as money exactly?

Q.    The budget.

A.    (Through Interpreter):  The budget?

Q.    Yes.    Did he explain to you what the budget was for any given project that you were working on him for?

A.    (Through Interpreter):    Yes.

Q.    Okay.    And he also explained to you how many people needed to work on each one of the projects at the shopping centers, right?

A.    (Through Interpreter):    I'm sorry?

Q.    Does he explain --

A.    (Through Interpreter):    The question is . . .?

I'm sorry.

Q.    Did he explain to you how many people he thinks needed to work on the -- on the different projects for you?

A.    (Through Interpreter):    Not necessarily.

Q.    Okay.    Well, at your deposition at page 29, lines 4 to 6, I'm just asking if you remember this question and answer that you gave under oath.

The question was:

        "Q.    Does he explain to you how many people he thinks need to work on the project?"

And your answer was:

        "A.    Yes."

Do you remember stating that under oath back in December of last year?

A.    (Through Interpreter):    Yes.

Q.    And is that your same answer today?

A.     (Through Interpreter):  Yes.

Q.     And isn't it also true that Mr. Elias Shokrian reviewed the hours that people spent working on the projects?

       INTERPRETER QUILLIAN:  And the interpreter needs the question repeated, please.

BY MR. ZIDELL:

Q.     Isn't it also true that Mr. Elias Shokrian reviewed the hours that people spent working on the projects, and that he was the one authorizing the payment?

A.     (Through Interpreter):  Well, I don't know if physically he was reviewing those documents, but he was the one that signed the checks when I would report the hours to him.

Q.     Okay.  And he's the one that actually authorized the payments, correct?

A.     (Through Interpreter):  Yes.

Q.     And he also reviewed the hours that the people spent working on those projects, right?

A.     (Through Interpreter):  As I said before, I don't know if he reviewed the hours or not.  He signed the checks, but I don't know if he reviewed the hours.  Because the checks are sent from California.

Q.     Okay.  Do you remember at your -- your deposition, at page 29, line number 7 going down, when you were asked last December under oath:

       "Q.    Does he ever review the hours that people spend

working on the projects?"

And your answer was:

"A.    Not in front of me.    Well, probably in his office he does.    And he's the one that authorizes the payments."

Is that correct?

A.    (Through Interpreter):    Yes.

Q.    And is that your same testimony today?

A.    (Through Interpreter):    Yes.

Q.    And when you said he was authorizing the payments, these are the payments to the different workers that were working cleaning up and maintaining those shopping centers for him, right?

A.    (Through Interpreter):    Yes.

Q.    And that would have included Mr. Arriaga, right?

A.    (Through Interpreter):    Yes.

Q.    And that's how it always was for all the years that Mr. Arriaga worked for these companies, correct, while you were his supervisor?

A.    (Through Interpreter):    Yes.

Q.    Okay.    Now --

A.    (Through Interpreter):    May I add something?

Q.    Not right now.    Unless the court wants to hear.

THE COURT:    It's up to counsel.

BY MR. ZIDELL:

Q.   Isn't it true that the defendants in this case never paid overtime to the people that were cleaning up the shopping centers and working there as employees?

Is that true?

A.   (Through Interpreter):   That they did not pay overtime?

Q.   That they did not pay overtime to the workers who were working more than 40 hours a week there.

A.   (Through Interpreter):   Well, we -- we sent the hours to California and then from there they made the payments.   I don't know if they paid overtime or not.

Q.   Okay.   Do you remember when you were asked at your deposition last December at page 37, line 3 going down, you were asked that when Mr. Arriaga started working for you was he paid overtime for the hours that he worked over 40 hours a week, and your answer was no.

And then the question was:

"Q.   Why was he not paid overtime for the hours he worked more than 40 hours a week when he first started working for you?"

And the answer was:

"A.   I really don't know why he did it."

Do you remember stating that -- stating that under oath?

A.   (Through Interpreter):   Yes.

Q.   Okay.   And is that your same answer today?

A.   (Through Interpreter):   Yes.

Q.    Because there came a time at the very beginning when Mr. Arriaga was hired, back in 2005, that the companies started requiring overtime work on a regular basis, correct?
     Correct?

A.    (Through Interpreter):  On some projects, yes.

Q.    All right.  So why weren't they paying overtime if Mr. Arriaga and the others were working overtime hours on those projects?

A.    (Through Interpreter):  I don't know.

Q.    Okay.  Did you ever think to ask as their supervisor?

A.    (Through Interpreter):  No.

Q.    And as the corporate representative for the company did you ever ask anybody regarding why the companies were not paying overtime to the workers that were working on these -- in these shopping centers?

A.    (Through Interpreter):  No.

Q.    And isn't it true that none of Mr. Arriaga's coworkers, meaning the maintenance workers, that none of them were being paid overtime either?

A.    (Through Interpreter):  No.

Q.    Is that correct?

A.    (Through Interpreter):  Yes.

Q.    Okay.  Can you just briefly tell the court about the time recording system that the companies had in place while Mr. Arriaga was working there and on which his work time was

purportedly recorded?

A.    (Through Interpreter):  At the beginning it was done manually, and then after that a machine where they punched in their time.

Q.    And when was the last time before today that you actually spoke to Mr. Shokrian?

A.    (Through Interpreter):  About work?

Q.    No.    About this case.

A.    (Through Interpreter):  Well, last night, when I was told about what happened with the attorney.

Q.    Right.    But I mean before that?

Was it last week?

Did he meet with you to prepare for this case?

A.    (Through Interpreter):  No, we did not get together, because he is in California.

Q.    Okay.    And during the pendency of this case, you being the corporate rep and all, did he ever talk to you about Mr. Arriaga and why he did not --

MR. ZIDELL:  Actually, you know what, I withdraw that question.

Can I just have a moment, judge?

THE COURT:  You may.

(Pause.)

BY MR. ZIDELL:

Q.    Can you just tell the court how you used to supervise

Mr. Arriaga beginning in -- in 2005 all the way through when he stopped working there in January of 2012?

What did you use to do to supervise him?

A.   (Through Interpreter):   Well, he had to clean the patios and also to cut the grass.

Q.   And how many shopping centers were there for him to work on during -- during that time period?

A.   (Through Interpreter):   There are four in the same area.

Q.   Okay.   And what -- can you just describe the magnitude or the size of these shopping centers, just so the court has an idea of how big they are and how many stores are in each one?

A.   (Through Interpreter):   Well, I don't have an exact idea of the size.   There were around 40 stores.

Q.   In each shopping center?

A.   (Through Interpreter):   No.

Q.   Altogether?

A.   (Through Interpreter):   Yes.

Q.   Okay.   And what was Mr. Arriaga -- what was he required to do at those four shopping centers while he worked there for the time that he was employed?

A.   (Through Interpreter):   To clean the patios and to cut the grass, paint, to wash the benches --

INTERPRETER QUILLIAN:   The interpreter stands corrected.

A.   (Through Interpreter):   -- to wash the sidewalks, and

several -- and several other jobs, but the majority were those.

Q.    Okay.  And where would he check in, in the morning, to punch in his card?

A.    (Through Interpreter):  We had a little room dedicated for that.

Q.    Where was that room located?

A.    (Through Interpreter):  Behind our office on the outside.

Q.    And where is your office located?

A.    (Through Interpreter):  It's in the shopping center.

Q.    Do you know the address?

A.    (Through Interpreter):  1625 North Story Road, suite 168.

Q.    And is that where Mr. Arriaga had to come and punch in and out each day that he worked there while you supervised him?

A.    (Through Interpreter):  Yes.

Q.    And is that location known as a certain shopping center?  Do you have a name for it?

A.    (Through Interpreter):  Plymouth Park North.

Q.    Okay.  And what are the names of the other three shopping centers that Mr. Arriaga worked at during the time that he was employed there?

A.    (Through Interpreter):  Plymouth Park South.

Q.    And how far away is that from the first one that you mentioned?

A.    (Through Interpreter):  Oh, just crossing over the street.

Q.    And the third -- the third one, what's that called?

A.    (Through Interpreter):  Plymouth Park West.

Q.    How far away is that from the first two.

A.    (Through Interpreter):  The same, across the street.

Q.    Okay.  And the fourth one, what is that called and how far away is that one?

A.    (Through Interpreter):  Plymouth Park East and it's also across the street.

Q.    Okay.  So they're all located within a few blocks of each other, is that fair to say?

A.    (Through Interpreter):  Yes.

Q.    Okay.  And as far as these -- is it true that you were told by the companies that they did not pay overtime?

A.    (Through Interpreter):  Yes.

Q.    And you knew that from the very beginning when you started working there, right?

A.    (Through Interpreter):  Yes.

Q.    Okay.  And that's what they told you when you first started working there, that the company's policy was that they did not pay overtime.  Correct?

A.    (Through Interpreter):  Yes.

Q.    Okay.  And you just don't know why that was, right?

A.    (Through Interpreter):  No.  At the beginning we all just

worked 40 hours.

Q.   But then that increased, right?

A.   (Through Interpreter):   Yes.

Q.   And you all started working overtime; is that right?

A.   (Through Interpreter):   Yes.

Q.   And that happened sometime around the year 2006, right?

A.   (Through Interpreter):   Yes.

Q.   And that continued on throughout all of Mr. Arriaga's employment there, right?

Correct?

A.   (Through Interpreter):   Well, Mr. Arriaga mainly worked the 40 hours.  I really don't know how much time, but basically that.

Q.   Well, have you taken a look at Mr. Arriaga's -- well, let me ask you this question.

Is it true or not that Mr. Arriaga was a trusted employee by you?

A.   (Through Interpreter):   He was a good employee.

Q.   And you also trusted him, because you gave him keys to all of these projects, right, where he worked?

A.   (Through Interpreter):   Yes.

Q.   Okay.  And did you give keys to all of the maintenance personnel that worked at these projects under you or just only select ones that you trusted?

A.   (Through Interpreter):   Not all of the employees had

keys.

Q.    Just the ones that you trusted, right?

A.    (Through Interpreter):  Yes.

MR. ZIDELL:  Okay.  I don't believe I have anything further from this witness.

THE COURT:  May this witness be excused and return to work?

MR. ZIDELL:  Yes.

One second.  One moment.

(Pause.)

MR. ZIDELL:  Nothing further.  He's free to go to work as far as we're concerned.

THE COURT:  Thank you, sir.

You may now leave the courthouse if you wish and return to work.  You are also welcome to stay.  This is a public proceeding.  If you've been requested by someone to stay, you are welcome to stay, but you are also permitted to leave if that's your wish.

THE WITNESS (Through Interpreter):  I'm going to stay for a while.

THE COURT:  All right.  You're free to have a seat at the table, sir.

And because he's staying we'll have the translation device remain with him.

You may proceed, counsel.

MR. ZIDELL: Yes. The next witness will be Mrs. Amanda Cano.

(Witness sworn.)

THE COURT: All right. Be seated, please.

And after you're seated, if you'll take the microphone and adjust it down where you can speak into the end of it.

THE WITNESS: Okay. And if you would begin by giving the court reporter your name and then spell your name for the court reporter.

THE WITNESS: Okay. Amanda Cano, A-m-a-n-d-a, last name C-a-n-o.

THE COURT: You may proceed, counsel.

MR. ZIDELL: Thank you, judge.

DIRECT EXAMINATION

BY MR. ZIDELL:

Q.   Mrs. Cano, can you tell the court how long you have been employed by the defendants in this case?

A.   Four years.

Q.   Four years?

A.   Um-hum.

Q.   What has been your job position during that time period?

A.   I'm the administrative assistant.

Q.   Okay. And do you also process payroll there?

A.   Yes.

Q.   And you've done that over the last four years?

A.    Yes.

Q.    Now, as far as I understand, based on Mr. Villenueva's testimony before this trial, and tell me if I'm wrong, but the way that payroll was processed is that he, Mr. Villenueva, would collect the time cards from the workers that worked under him, turn those in to you and then your office here would send those to California for processing; is that correct?

A.    Yes.

Q.    And how often were the time cards actually turned in to you?

A.    Each time we did the payroll.

Q.    And was that on a weekly, biweekly or some other basis?

A.    It is bimonthly.

Q.    All right.  And what does bimonthly mean?

A.    Every 15th and 30th or 31st of the month.

Q.    Is this how this company has always processed its payroll for their employees?

A.    Yes.  As long as I've been working there.

Q.    All right.  Now, what exactly is your function in the office?

     What do you do with the time cards that Mr. Villenueva would send you after he had gathered them from his workers?

A.    I would get 'em and just calculate the hours and then we would fax 'em over to the California office.

Q.   Okay.  And you were doing this while Mr. Arriaga worked there, correct?

A.   Yes.

Q.   All right.  Have you looked over some of Mr. Arriaga's time reports or time cards before coming here today?

A.   No.

Q.   Okay.  Have you ever seen them before coming here today?

A.   When he was employed there, yes.

Q.   All right.  Did it ever come to your attention that the vast majority of his time records were indicating that he was working a lot of overtime hours each week for the company?

A.   Yeah, sometimes.

Q.   Okay.  And did you ever inquire as to why the companies were not paying him overtime wages for those overtime hours?

A.   No.

Q.   Did you ever ask anybody about that?

A.   No.  It was just told to me when I started working there.

Q.   What was told to you?

A.   That we don't pay overtime there.

Q.   Who told you that?

A.   I don't remember.

Q.   Okay.  Somebody above you?

A.   Yes.

Q.   Okay.  Who is your direct supervisor?

A.    Elishia Shokrian.

Q.    Elias?

A.    Elishia.

Q.    Who is that?

A.    She is the daughter of the owner.

THE COURT:   Do you know how she spells her first name?

THE WITNESS:   E-l-i-s-h-i-a.

BY MR. ZIDELL:

Q.    And did she tell you that before you started working there as the administrative assistant in the office?

A.    I don't remember exactly who told me, but I know I was told when I started working.

Q.    Okay.   Whoever that person was that told you, was it a -- a person above you in -- in management authority?

A.    Yes, it had to be somebody over me.

Q.    All right.   And did you find that odd or curious in any way?

A.    Yes.

Q.    But you didn't ask any questions about it?

A.    No.

Q.    Okay.   Did you think that that would jeopardize your own job if you asked anybody why they were not paying overtime to their workers?

A.    No.   It's just somebody superior over me told me, so I

just do as I was told.

Q.    Okay.  After this lawsuit was filed has the company changed their policies at all as far as paying their workers overtime?

A.    No.  Nobody works over the 40 hours anymore.

Q.    Oh, after this lawsuit was filed?

A.    I don't remember how long, but nobody has worked over.

Q.    Okay.  How long have you noticed that the employees time cards are not reflecting overtime?

A.    They get paid salary -- salary now, so we don't go by hours, but I don't think they let them work over the 40 hours.

Q.    Did the company -- did the company make a decision after this lawsuit was filed not to pay anybody else by the hour but rather to pay everybody by salary?

A.    No.

Q.    Are there any hourly workers that still clean up these same four shopping centers --

A.    No.

Q.    -- that Mr. Villenueva testified to?

A.    No.

Q.    What?

A.    No.

Q.    There are no more hourly workers that work there?

A.    No.

Q.    When did that cease to be, do you know?

I mean, if Mr. Arriaga left somewhere at the beginning of -- of January 2012, using that as a marking point, can you tell us when the companies stopped having hourly employees work at these shopping centers?

A.    No, I don't remember when.

Q.    Was it sometime after Mr. Arriaga left?

A.    I really don't recall when -- when it started.

Q.    Do you remember whether Mr. Arriaga was an hourly employee?

A.    Yes, he was.

Q.    Okay.  So is it fair to say that it happened sometime after he left the company?

A.    I don't remember.  I don't want to say because I -- I just don't remember if he was there when we started the whole salary thing or if it was after.  I don't want to say a statement that's not true.  I don't remember.

Q.    And who told you to implement the salary position, so to speak?

A.    The manager that we had, Gary Lacey.

Q.    Okay.  And do you remember when he told you that at all?

A.    No, sir.

        MR. ZIDELL:  May I just have a moment, judge, with . . .?

        THE COURT:  You may.

        MR. ZIDELL:  Thank you.

(Pause.)

MR. ZIDELL:  May I just use the ELMO, judge, if that's okay.

THE COURT:  You may.

BY MR. ZIDELL:

Q.    I just want to show you a couple of exhibits that we have for this case and just ask you if you recognize these.  Okay?

A.    Okay.

Q.    I'm putting on the projector a time card report for the period of 5/27/11 to 6/13/11 for Mr. Arriaga.  And I'm just going to ask you if you recognize the form of this type of report.

A.    Yes.

Q.    Okay.  Now, if you look at the bottom one there, do you see where this -- this week period shows that he worked 61.54 hours in that particular work week?

A.    Yes.

Q.    Okay.  Do you have any idea as to why he was not paid overtime for that work week, for example, just as an example?

A.    I don't know why he was just paid straight -- like straight time, the hours.

Q.    Okay.  And would that be true of all of his time cards and time reports?

A.    Yes.  We paid just straight time.

Q.    Okay.  And what type of a report is this, by the way?

What -- what do you refer to this as?

A.   That's the -- the computer would generate that once I would just clock in each time, so that's like the time card report.

Q.   Are these the reports that you would receive before you processed them and sent them on to California?

A.   No.   I would receive the actual time cards, where they were punched in or -- or handwritten.   I would put the times into the computer, which would generate these reports.

Q.   Okay.   So you were very conscious --

A.   Yes.

Q.   -- of when he was working overtime, correct?

A.   Yes.

Q.   And you actually sent that to California, right?

A.   Yes.

Q.   Did anybody from California, from Califco or any of the companies' representatives from California ever ask you or tell you anything regarding why the companies did not pay overtime?

A.   No.   Because they knew as well.

Q.   They knew that they weren't paying overtime, right?

A.   Yes.   That's our corporate office.

Q.   They just told you they didn't pay it period, right?

A.   Yes.

Q.   And corporate in California told you that when, exactly?

A.   Whenever I would turn in the time cards.

Q.   Okay.

A.   I mean, it was never discussed anymore after we would send it.  It was just something that we knew.

Q.   That the companies just didn't pay it?

A.   Yes.

Q.   Okay.

MR. ZIDELL:  Okay.  I don't think I have anything further from this witness.

Thank you.

THE COURT:  Is there any objection to excusing her where she can return to work?

MR. ZIDELL:  No objection.

THE COURT:  All right.  Ma'am, you may step down.  You may leave the courthouse if you wish.  But this is also a public proceeding, if you'd like to stay you're welcome to stay and watch.

THE WITNESS:  Okay.

THE COURT:  You may call your next witness.

MR. ZIDELL:  We would like to call the plaintiff, Mr. Pedro Arriaga at this time.

(Witness sworn.)

THE COURT:  Be seated, please.

DIRECT EXAMINATION

BY MR. ZIDELL:

Q.   Mr. Arriaga, can you tell the court where you're from.

A.   (Through Interpreter):   From Mexico.

Q.   And when did you -- and how old are you?

A.   (Through Interpreter):   41.

Q.   And can you tell the court your level of education?

A.   (Through Interpreter):   Up through first grade of elementary school.

Q.   And do you know how to read?

A.   (Through Interpreter):   No.

Q.   Do you know how to write?

A.   (Through Interpreter):   No.

Q.   Okay.   Can you tell the court when you first started working for the defendant companies in this case?

A.   (Through Interpreter):   In 2005.

Q.   Do you remember when it was in 2005 that you started working?

A.   (Through Interpreter):   In April.

Q.   And how long did you continue to work for the companies as a full-time employee?
     Until when?

A.   (Through Interpreter):   When I started there I worked for about a month working 40 -- 40 hours a week.   And then after that it was more than 40 hours.

Q.   Okay.   And until what year did you work there?
     When did you leave the company?

A.    (Through Interpreter):   In 2012.

Q.    What month?

A.    (Through Interpreter):   January.

Q.    Do you remember the date?

A.    (Through Interpreter):   The 10th.

Q.    Okay.   And how much were you paid per hour for this entire time period that you were employed by the defendants?

A.    (Through Interpreter):   8.50.

Q.    Per hour?

THE WITNESS:   Yeah.

A.    (Through Interpreter):   Yes.

Q.    Okay.   Can you tell the court how many hours a week you were claiming that you worked as a maintenance man at the defendant's shopping centers for this time period?

A.    (Through Interpreter):   62 hours.

Q.    Per week?

A.    (Through Interpreter):   Per week, yes.

Q.    Okay.   And how many days a week were you working for the most part for the defendants for the time that you were employed there?

A.    (Through Interpreter):   Sometimes I worked six, sometimes seven.

Q.    Days?

A.    (Through Interpreter):   Yes.

Q.    Per week?

A.    (Through Interpreter):    Yes.

Q.    Was it always like that or were there some weeks that you worked only five days?

A.    (Through Interpreter):    Yes.

Q.    Okay.    The average was how many days a week during this time period?

A.    (Through Interpreter):    Six.

Q.    Okay.    What time would your workday begin.

When would you normally punch in on the time clock?

A.    (Through Interpreter):    From 7:00 in the morning until 7:00 in the evening.

Q.    Okay.    Was that your normal working schedule there?

A.    (Through Interpreter):    Yes.

Q.    For five, six, or seven days per week?

A.    (Through Interpreter):    Yes.

Q.    Can you tell the court what you did there from 7:00 in the morning until 7:00 at night thereabout.

A.    (Through Interpreter):    They had us to gather up the trash.    And they had us to go cut the yard.    To clean the windows.    To throw out the asphalt.    To clean the sidewalks --

INTERPRETER QUILLIAN:    And the interpreter wants to get clarification.

A.    (Through Interpreter):    -- to lay the asphalt.    And they had us to go check the roofs, go make sure they weren't leaking.

Q.    How many people were you working with in your maintenance crew servicing these four shopping centers?

A.    (Through Interpreter):  We just had two coworkers.

Q.    Okay.  So there were three of you in total?

A.    (Through Interpreter):  No.  There were just two of us.

Q.    Okay.  And what was the name of the other coworker that used to go with you to clean these shopping centers?

A.    (Through Interpreter):  Daniel D-a-n-i-e-l Cano C-a-n-o.

Q.    And who was your supervisor during this entire time period?

A.    (Through Interpreter):  Mr. Albino Villenueva.

Q.    And how often would he have contact with you to tell you what to do and how to do your job there?

A.    (Through Interpreter):  He would call me on the telephone.

Q.    How often?

A.    (Through Interpreter):  Every time he needed me he called me on the phone.

Q.    And would you speak to him on a daily basis, weekly basis or some other basis?

A.    (Through Interpreter):  Yes.  Daily.

Q.    And would he come out physically to the properties to check to see what you were doing there?

A.    (Through Interpreter):  Yes.

Q.    Okay.  And was he also the one that was signing off on your time cards that you punched in and out on, for the most part?

A.    (Through Interpreter):  I don't know if he signed them.

Q.    Did you sign them?

A.    (Through Interpreter):  No.

Q.    Did you sign any of them?

A.    (Through Interpreter):  No.

Q.    How would you -- where did you go actually to mark your time card there while you worked there?

A.    (Through Interpreter):  Behind the office where they had a little room where you could go punch in and out.

Q.    Okay.  And did you do that every morning and every evening when you stopped working?

A.    (Through Interpreter):  Yes.

Q.    And then what would you do with your time card after you punched it in and out each day?

A.    (Through Interpreter):  They had a little table there so we could leave them there.

Q.    Did you have a little slot there with your name on it to put it into or did you just leave it on top of the table?

A.    (Through Interpreter):  No.

Q.    You just left it on top of the table?

A.    (Through Interpreter):  Yes.

Q.    And then who would come collect it in order to get you

paid?

A.    (Through Interpreter):   Mr. Albino Villenueva would pick them up.

Q.    Okay.   How often would he collect them?

A.    (Through Interpreter):   Every weekend.

Q.    And for the time that you were working there what -- did you take any lunch breaks?

A.    (Through Interpreter):   Once a day.

Q.    And how long did that last for?

A.    (Through Interpreter):   One hour.

Q.    And when you were working for the company did anybody ever tell you from management why they were not paying you overtime when you worked over 40 hours a week?

A.    (Through Interpreter):   No, no one told me.

Q.    Did the company always deduct the hour's lunch from your pay, based on what you know?

A.    (Through Interpreter):   Yes.

Q.    For all of the years that you worked there?

A.    (Through Interpreter):   Yes.

Q.    To your knowledge did the company ever pay you for your lunch break that you took there?

A.    (Through Interpreter):   No.

Q.    Okay.   Now, for the last three years that you worked for the company from January of '09 until you left in January of 2012, based on the 62 hours a week that you said that you were

working at 8.50 an hour, can you tell the court how much you're claiming, at least, for those last three years that you worked there?

A.    (Through Interpreter):   Yes.

Q.    How much is that?

A.    (Through Interpreter):   $14,500.31.

Q.    Okay.

        MR. ZIDELL:   May I just have a moment then?

        THE COURT:   You may.

BY MR. ZIDELL:

Q.    Do you know Elias Shokrian?

A.    (Through Interpreter):   Yes.

Q.    Did he used to come out and visit the properties where you were working?

A.    (Through Interpreter):   Yes.

Q.    And did you know that he was an owner or the boss there?

A.    (Through Interpreter):   Yes.

Q.    How did you know that?

A.    (Through Interpreter):   Albino told us.

Q.    What did Albino tell you about Mr. Shokrian when he came out to the property?

A.    (Through Interpreter):   That he was the owner.

Q.    Anything else besides that?

A.    (Through Interpreter):   And he's the one that would review and check the properties.

Q.   Did you see him speaking to Albino about the progress or the work that needed to be done there?

A.   (Through Interpreter):   No.

Q.   Okay.

MR. ZIDELL:   I don't believe we have anything further.

THE COURT:   Thank you, sir.

You may step down.

MR. ZIDELL:   We don't have any further witnesses, judge, but at this time we would just like to read certain pleadings and discovery into the record, if we could.

THE COURT:   You may proceed.

MR. ZIDELL:   Thank you.

We served requests for admissions on the defendants.

And question number 3 was:   Admit that you never paid the plaintiff overtime wages during the plaintiff's entire employment period with you for the time period as stated in the complaint.

And the response was:   Admit.

I'd also like to read from certain portions of the answer to the complaint that's document entry number 6 that was filed on February 2nd, 2012.

Paragraph number 6 of the answer says that defendant Elias Shokrian admits that he is a manager for defendants Califco, LLC, Jess Enterprises, LLC, and Jess Enterprises,

LLC, is the general partner of SEJ Properties LP and that the defendants deny the remaining allegations of the paragraph number 6.

And we would like to move our exhibit notebook into evidence at this time.

THE COURT:  Would you identify the exhibit numbers? You don't have to do it individually.  I just need a range.

MR. ZIDELL:  Sure.  This consists of Exhibits 1 through 22.

THE COURT:  Plaintiff's Exhibits 1 through 22 are admitted in evidence.

MR. ZIDELL:  Okay.  At this time, jurisdiction having been stipulated to by the parties under the FLSA, the plaintiff rests their case -- his case.

THE COURT:  All right.  Thank you, counsel.

At this time if you would advise the court of the time period in question.  The witness I believe testified to a last employment date of January 10, 2012.  The pretrial order stipulates that January 7, 2012, is the last date, so that's the date I would be using.

MR. ZIDELL:  Sure.  And that's fine with us.

THE COURT:  And then as far as going back three years, I believe January 11, 2009, would be correct --

MR. ZIDELL:  Yes.

THE COURT: -- because the lawsuit was filed January 11, 2012.

MR. ZIDELL: Yes, sir.

THE COURT: So the figure to which your client testified of $14,500.31 would be for that three-year period; is that correct?

MR. ZIDELL: Yes, it is, judge.

THE COURT: And then for a willful violation you would be requesting that same amount in addition?

MR. ZIDELL: Yes.

THE COURT: All right. The -- the court finds that a willful violation was established by the evidence.

Is there anything else in terms of relief prior to the attorney's fees that would be submitted separately?

MR. ZIDELL: Other than a -- a motion for liquidated damages, which we would submit at the same time as a fee motion, if it's acceptable to the court, no, there would be no other relief, other than I know Mr. Manteuffel has done an analysis of the time cards, if the court wants to know his summation of what he found in the time cards themselves as far as how much overtime is actually due to the plaintiff, then he can recite that to the court at this time.

THE COURT: Unless that figure is different from what your client testified to, in other words, unless you're seeking more than that --

MR. ZIDELL:  No.  No.  We're not.  We would just stick with the plaintiff's testimony in that regard.

THE COURT:  As far as liquidated damages, I'm in a position to award those today based on the testimony.

MR. ZIDELL:  Sure.

THE COURT:  That would then take care of the willful violation; is that correct?

MR. ZIDELL:  Yes, sir.

THE COURT:  Okay.

MR. ZIDELL:  Yes.  In the absence of any good faith defense that the defendants would have otherwise put on.

THE COURT:  Correct.

MR. ZIDELL:  Yeah.

THE COURT:  So where we stand now is your client has established the -- the $14,500.31 and we go back and pick up the -- the third year because of the proof of the willful violation.  In addition, the finding of a willful violation also supports an award of liquidated damages in a like amount of $14,500.31.

MR. ZIDELL:  Yes, sir.

THE COURT:  So then you would also be able to apply for an award of attorney's fees postjudgment.

MR. ZIDELL:  Yes, sir.

THE COURT:  Okay.  I think it would be helpful if you -- at the time you submitted your attorney fee application

if you submitted some brief findings of fact and conclusions of law proposed.  And by "brief" I mean they don't need to be the kind of detail that you would submit in a nonjury trial, they really -- really what I'm looking to cover is the essential elements of liability, the essential elements of willful, any predicate findings that would be needed for liquidated damages --

MR. ZIDELL:  Sure.

THE COURT:  -- just so we have those of record in the case of any appeal or some other challenge to it.

MR. ZIDELL:  Will do.  Yes.

THE COURT:  All right.  And if you do not need additional time, I would be looking for that within 14 days.  But if your schedule is such that you need more time, if you would just let that request be known, I can accommodate your request.

MR. ZIDELL:  Sure.

THE COURT:  Because my intention would be to go ahead and enter judgment today based on the -- what would end up being around $29,000.

MR. ZIDELL:  Sure.  If we could have 21 days instead of 14 it would be helpful, just because of our backlog.

THE COURT:  That's fine.

MR. ZIDELL:  Thank you, judge.

THE COURT:  Do you want to put anything else on the

record, Mr. Zidell?

MR. ZIDELL:  We don't.  In our conclusions of law and findings of fact we'll -- we'll cover all areas I believe adequate for the court.

THE COURT:  All right.  Well, I'll go ahead and state on the record that based upon the proof presented the plaintiff -- well, I suppose one other thing that would be helpful would be for you to state the theory on which you're relying as to the two defendants who have not admitted that they were his employer, so that I can place that on the record today.

MR. ZIDELL:  Okay.  As far as Jess Enterprises is concerned, I believe that the court entered a default against them, so through that default they would be deemed liable for these wages.

As far as Elias Shokrian is concerned, we have -- I mean, I have case law, if the court wants for me to recite it into the record or else we can just put it in our -- in our conclusions of law with that memorandum that the court requested before, but in a nutshell basically that Mr. Shokrian was -- was controlling the plaintiff's work, if you will, through his supervisor, that the supervisor admitted that Mr. Shokrian was the boss, he got the time cards, he gave the budget for the project, he told him how fast the work needed to be done and what needed to be done.  He also I

believe approved the payments, according to Mr. Villenueva's testimony.  That is enough, in and of itself, under the FLSA to prove-up individual liability in the light most favorable to the plaintiff and since no defense was put on to that and we will brief that if the court wants in our conclusions of law.

THE COURT:  There's no need.  I just wanted to make sure I had that on the record.

MR. ZIDELL:  Sure.  Okay.

THE COURT:  And you've anticipated that in the proposed findings and conclusions, findings of that type regarding individual liability would be helpful to address any sort of appeal that might be taken --

MR. ZIDELL:  Sure.

THE COURT:  -- or challenge later.

MR. ZIDELL:  Sure.

THE COURT:  And regarding the drafting of the judgment, is it your position that these four defendants would be jointly and severally liable?

MR. ZIDELL:  Yes, sir.

THE COURT:  All right.

MR. ZIDELL:  Yes, sir.

THE COURT:  The court finds based upon the presentation of the evidence that the plaintiff has established his claim for unpaid overtime -- overtime

compensation against each of the four defendants, that he has established the individual liability of Mr. Elias Shokrian, that the remaining three defendants have defaulted as to liability, but moreover, the plaintiff has shown their liability by his evidence, including the exhibits that were admitted.

The plaintiff has also established a willful violation, therefore, the period of time goes back three years prior to the filing of suit.

He's established that the unpaid overtime equals $14,500.31.

And he has further established a willful violation.

And the court concludes that he is also entitled to recover liquidated damages in light of the evidence and therefore awards an additional sum of $14,500.31.

The court will enter a judgment for joint and several liability against the four defendants for $29,000.62.

And the plaintiff may also make application for attorney's fees.

The court has granted the plaintiff's request for a period of 21 days to make that submission.  And if he will at that time submit proposed findings and conclusions.  Usually that's done by submission electronically to Fitzwater orders, that way if I want to edit them I can more easily edit them.

MR. ZIDELL:  Sure.

THE COURT:  Counsel, do you have anything further you want to put on the record?

MR. ZIDELL:  Nothing further.

Thank you for your time, judge.

THE COURT:  I also want the record to reflect that Mr. Villenueva did remain in court and that he had the benefit of the Spanish language interpreter here, given that he was invited to remain.  I would just like the record to reflect that he did choose to remain and was able to hear the proceedings.

MR. ZIDELL:  Thank you, judge.

THE COURT:  All right.  At this time then the court will stand in recess.

THE SECURITY OFFICER:  All rise.

                    (End of proceedings.)

**INDEX**

| Witness Name | Page | Line |
|---|---|---|
| **ALBINO VILLANUEVA** | | |
| DIRECT EXAMINATION BY MR. ZIDELL ................. 25 | | 12 |
| **AMANDA CANO** | | |
| DIRECT EXAMINATION BY MR. ZIDELL ................. 41 | | 14 |
| **PEDRO ARRIAGA** | | |
| DIRECT EXAMINATION BY MR. ZIDELL ................. 49 | | 24 |

| Plaintiff Rests | Page | Line |
|---|---|---|
| MR. ZIDELL........................................... 58 | | 15 |

**PLAINTIFF EXHIBITS**

| Exhibit | Description | Identified | Admitted | Denied |
|---|---|---|---|---|
| 1 - 22 | En masse.............. 58 | | 58 | |

< Dates >
5/27/11 47:10
6/13/11 47:10
AUGUST 19, 2013
1:16, 3:1
December 21st,
2012 28:20
February 2nd,
2012 57:22
January 10, 2012
58:19
January 11, 2009
58:24
January 11, 2012
21:14, 59:1
January 2012
46:2
January 7, 2012
58:20
November, 2013.
67:2
$14,500.31 59:5,
60:15
$14,500.31.
56:6, 60:19,
64:11, 64:15
$29,000. 61:20
$29,000.62.
64:17
'09 55:24


< 1 >
1 58:9, 58:11,
66:34
1. 24:8
10:00 19:9,
19:24, 20:16,
20:19
10:00. 20:24
10th 25:20, 51:5
1100 2:41
112 1:27, 1:36
12 66:8
12-CV-00094-D
1:5
14 61:13, 61:22,
66:12
14th 67:2
15 7:21, 9:2,

11:1, 11:2,
66:23
1535 2:41
15th 42:16
1625 37:12
168. 37:12
168th 8:10
18 29:3


< 2 >
20 7:22
2004. 26:12
2005 23:8, 34:2,
36:1, 50:15
2005. 50:14
2006 39:6
2007. 26:22
2012 36:2, 55:25
2012. 51:1
21 61:21, 64:21
214.662.1557
2:43
216(B 1:7
22 58:11, 66:34
22. 58:10
24 66:16
28 29:1, 29:2
29 1:7, 30:14,
31:23


< 3 >
3 33:12, 57:15
30(b 25:22
30th 42:16
31st 42:16
37 33:12
3: 1:5


< 4 >
4 2:6, 30:14
40 33:7, 33:14,
33:18, 36:13,
39:1, 39:12,
45:5, 45:11,
50:22, 50:23,
55:13
401 2:6

41. 50:4
42 25:18


< 5 >
58 66:34
5815 66:23


< 6 >
6 30:14, 57:21,
57:23
6. 58:3
61.54 47:15
62 51:15, 55:25
6220 2:5
6310 1:27, 1:35


< 7 >
7 31:23
75240 1:28, 1:37
75242 2:42
75248 2:7
7:00 52:10,
52:11, 52:16,
52:17


< 8 >
8.50 56:1
8.50. 51:8


< 9 >
972/233-2264
1:29, 1:38
972/503-6338 2:8
9:00 11:10
9:00. 10:17
9:10. 10:18
9:15 9:1, 9:8
9:15. 10:15
9:35. 20:23


< A >
A-m-a-n-d-a
41:10
A. 1:19, 2:3,

21:2
a.m. 11:10
able 60:21, 65:9
above 43:23,
44:15
absence 60:10
Absolutely 19:17
accept 16:17,
22:10
acceptable 59:17
accommodate
18:3, 22:2,
61:15
accomplished
29:18
according 63:1
accordingly 6:6
accurately 11:18
acknowledge
27:16, 27:23
across 38:6,
38:10
action 25:23
actions 22:14
actual 48:7
Actually 17:21,
22:25, 28:16,
31:13, 35:5,
35:19, 42:10,
48:14, 54:9,
59:21
add 32:22
addition 59:9,
60:17
additional
61:13, 64:15
Additionally
6:18
address 3:9,
11:17, 12:12,
13:14, 37:11,
63:12
adequate 62:4
adjust 41:6
administrative
41:22, 44:11
admissibility
17:14
admissions
10:12, 57:14

Admit 57:15, 57:19
admits 57:24
Admitted 58:12, 62:9, 62:22, 64:6, 66:32
admitting 10:3
advise 5:8, 7:5, 10:23, 58:17
advised 3:8, 3:21, 5:3, 8:9, 8:12, 15:9, 22:6
affidavit 16:17, 17:15
affirmative 23:5, 23:6, 23:19
ago 20:13
agreed 16:1
agreement 16:21
ahead 16:12, 23:10, 23:12, 23:22, 61:19, 62:5
al 1:15
ALBINO 3:14, 4:24, 5:7, 24:16, 53:12, 55:2, 56:19, 56:20, 57:1, 66:6
Alejandro 19:2
alert 19:18
allegations 58:2
allow 5:6, 5:10
Although 21:18
Altogether 36:16
AMANDA 41:2, 41:10, 66:10
amount 7:8, 59:9, 60:18
analysis 59:19
answer 29:2, 29:5, 29:9, 30:15, 30:20, 30:25, 32:2, 33:15, 33:20, 33:24, 57:20, 57:23
answers 23:17

anticipated 63:10
anybody 34:13, 43:16, 44:23, 45:13, 48:16, 55:11
apparent 22:4
apparently 8:14
appeal 61:10, 63:13
appear 4:10, 8:7, 15:8, 16:1, 16:9, 18:4, 20:6, 21:17, 22:12
appearance 9:12
appeared 25:21
application 60:25, 64:18
apply 10:11, 17:22, 60:21
approach 3:18, 10:21, 24:18
approved 63:1
April 50:17
area 36:8
areas 62:3
Around 9:5, 9:6, 26:18, 36:13, 39:6, 61:20
arranged 24:23
ARRIAGA 1:5, 3:6, 18:13, 21:7, 27:11, 32:15, 32:18, 33:13, 34:2, 34:7, 34:17, 34:25, 35:18, 36:1, 36:18, 37:13, 37:21, 39:8, 39:11, 39:14, 39:16, 43:1, 43:4, 46:1, 46:6, 46:8, 47:10, 49:21, 50:1, 66:14
asphalt 52:20, 52:23
assistant 41:22,

44:11
assuming 8:1, 24:24
assumption 21:19
attend 11:10
attention 4:7, 43:9
attorney 7:11, 11:8, 12:17, 12:25, 13:4, 21:22, 22:3, 23:1, 35:10, 59:14, 60:22, 60:25, 64:19
attorney/client 13:24
authority 8:1, 10:4, 10:11, 44:15
authorized 31:13
authorizes 32:4
authorizing 31:9, 32:10
available 9:25
average 52:5
avoid 6:11, 7:16
award 60:4, 60:18, 60:22
awards 64:15
aware 4:8
away 18:6, 37:24, 38:5, 38:8


< B >
back 7:2, 9:11, 17:5, 19:18, 23:8, 30:22, 34:2, 58:23, 60:15, 64:8
backlog 61:22
based 8:6, 8:7, 22:12, 42:2, 55:16, 55:25, 60:4, 61:19, 62:6, 63:23
basically 39:13, 62:20
basis 6:8, 10:2,

27:4, 34:3, 42:13, 53:20, 53:21
became 26:20
began 26:14
begin 41:7, 52:8
beginning 23:16, 34:1, 35:2, 36:1, 38:17, 38:25, 46:1
begins 3:9
behalf 3:22
Behind 37:8, 54:11
believe 16:4, 16:6, 16:20, 18:3, 19:3, 24:6, 40:4, 57:5, 58:18, 58:24, 62:3, 62:13, 63:1
BENCH 1:18, 3:1
benches 36:22
benefit 65:6
Benitez 19:2
bent 25:9
besides 56:23
best 14:22, 17:18
big 36:11
bimonthly 42:14, 42:15
biweekly 42:13
blocks 38:11
Bonilla 19:2
bookkeeper 18:2, 19:7
boss 28:7, 56:16, 62:23
bottom 47:14
break 18:5, 55:21
breaks 55:7
brief 22:20, 61:1, 61:2, 63:5
briefly 34:23
bring 4:6, 9:10
brought 6:19
budget 29:20, 29:24, 29:25,

30: 1, 62: 24
Building 2: 6
busy 6: 23

< C >
C-a-n-o 41: 11,
53: 9
calculate 42: 24
Califco 1: 15,
14: 7, 48: 16,
57: 25
California
31: 21, 33: 9,
35: 15, 42: 7,
42: 25, 48: 6,
48: 14, 48: 16,
48: 17, 48: 25
call 8: 13, 13: 3,
18: 9, 18: 25,
19: 3, 22: 19,
24: 16, 49: 19,
49: 20, 53: 15
called 38: 3,
38: 7, 53: 18
Campbell 2: 5
CANO 19: 7, 41: 2,
41: 10, 41: 16,
53: 8, 66: 10
Cano-aguillon
18: 20
caprice 6: 10
card 37: 4, 47: 9,
48: 3, 54: 10,
54: 16
cards 42: 5,
42: 10, 42: 22,
43: 5, 45: 9,
47: 22, 48: 7,
49: 1, 54: 2,
59: 19, 59: 20,
62: 23
care 60: 6
Carlos 19: 2
Carse 2: 3, 2: 4,
3: 11, 3: 18,
5: 23, 6: 1, 6: 5,
7: 14, 8: 22,
8: 25, 10: 21,
12: 21, 12: 25,

13: 13, 14: 10,
18: 4, 18: 9,
18: 22, 19: 14,
20: 20, 21: 11
case 4: 5, 6: 8,
6: 15, 6: 17,
6: 23, 6: 25, 7: 1,
7: 11, 7: 14, 8: 5,
9: 17, 9: 19,
15: 11, 18: 5,
19: 10, 20: 8,
20: 10, 20: 11,
20: 13, 20: 16,
23: 6, 23: 15,
24: 7, 25: 21,
25: 24, 26: 11,
28: 17, 33: 1,
35: 8, 35: 13,
35: 16, 41: 17,
47: 7, 50: 13,
58: 15, 61: 10,
62: 17
cause 6: 7
cease 45: 25
center 36: 14,
37: 10, 37: 17
centers 29: 15,
29: 21, 30: 6,
32: 12, 33: 3,
34: 15, 36: 6,
36: 10, 36: 19,
37: 21, 45: 17,
46: 4, 51: 14,
53: 2, 53: 7
certain 10: 3,
11: 12, 16: 18,
37: 17, 57: 10,
57: 20
certainly 6: 3,
10: 9, 10: 10,
18: 8
certify 66: 39,
66: 42
challenge 61: 10,
63: 15
changed 45: 3
charge 6: 16,
27: 9
check 37: 3,
52: 24, 53: 24,

56: 25
checks 31: 12,
31: 19, 31: 20
chief 9: 17,
9: 20, 26: 17
chips 8: 13
choose 65: 9
circuit 7: 6,
15: 6
circumstances
5: 24, 8: 16,
15: 11, 16: 7,
16: 16, 19: 4,
20: 12, 23: 19
claim 63: 25
claiming 51: 13,
56: 2
clarification
52: 22
clean 36: 4,
36: 21, 45: 16,
52: 19, 52: 20,
53: 7
cleaning 32: 12,
33: 2
clear 11: 22,
12: 2, 21: 10
cleared 13: 18
clearing 3: 14
clearly 20: 13
client 4: 3,
4: 14, 6: 10,
6: 22, 16: 15,
59: 4, 59: 24,
60: 14
clock 48: 3, 52: 9
collect 42: 5,
54: 25, 55: 4
coming 14: 2,
43: 5, 43: 7
commence 21: 20
Commerce 2: 41
communicate
10: 6, 14: 4,
14: 13
communicated
11: 3, 11: 14,
11: 15, 12: 3,
12: 4
communication

18: 22, 19: 16,
28: 15
companies 14: 15,
25: 23, 26: 1,
26: 11, 27: 19,
27: 21, 32: 18,
34: 2, 34: 13,
34: 24, 38: 15,
43: 13, 46: 3,
48: 17, 48: 18,
49: 5, 50: 13,
50: 18
company 34: 12,
38: 21, 42: 17,
43: 11, 45: 2,
45: 12, 46: 12,
50: 25, 55: 11,
55: 15, 55: 20,
55: 24
compensation
64: 1
competence 24: 24
complaint 21: 14,
57: 18, 57: 21
complete 6: 4
comply 66: 42
computer 2: 48,
48: 2, 48: 9
concern 23: 21
concerned 16: 24,
23: 4, 40: 12,
62: 13, 62: 16
concerning 4: 5
conclude 22: 11
concludes 64: 13
concluding 6: 9
conclusions
61: 1, 62: 2,
62: 19, 63: 5,
63: 11, 64: 22
conduct 22: 25
confer 4: 19
Conference 6: 15,
6: 24, 8: 13,
10: 8, 15: 14,
16: 1, 18: 11,
66: 43
confirmed 13: 4
conscious 48: 10
consequence 5: 9

consequences 12:19
consider 10:11
consists 58:9
contact 4:3, 5:8, 53:13
contacted 4:3
context 11:22
continuance 3:25, 4:15, 5:19, 5:24, 6:1, 7:2, 11:4, 11:25, 14:16, 15:5, 20:3
continue 14:22, 20:8, 20:16, 50:18
continued 39:8
continuing 6:7
controlling 62:21
conversation 10:24, 11:16, 13:17, 13:20, 13:21, 13:24
corporate 3:13, 4:17, 4:25, 5:3, 11:2, 11:3, 13:15, 25:22, 34:12, 35:17, 48:22, 48:25
Correct 7:19, 13:25, 25:3, 26:1, 27:24, 29:18, 31:14, 32:6, 32:18, 34:3, 34:4, 34:21, 38:22, 39:10, 42:8, 43:2, 48:12, 58:24, 59:6, 60:7, 60:12
corrected 36:24
cost 22:1
Counsel 3:5, 3:9, 4:1, 6:8, 6:9, 6:12, 6:14, 6:22, 9:15, 15:13, 32:24, 40:25, 41:12,

58:16, 65:1
County 8:10
couple 47:6
courthouse 40:14, 49:15
courtroom 4:4, 4:18, 8:19, 11:10, 21:12
cover 61:4, 62:3
coworker 53:6
coworkers 34:17, 53:3
crew 53:2
crews 27:3
criminal 6:25
cross-examine 15:21, 17:13
crossing 38:1
CRR 2:40, 67:7
CSR 66:39
curious 44:17
currently 26:23
cut 36:5, 36:21, 52:19


< D >
D-a-n-i-e-l 53:8
Daily 53:20, 53:22
Dallas 1:3, 1:12, 1:28, 1:37, 2:7, 2:42, 8:10, 28:8, 67:10
damages 16:18, 22:23, 23:4, 59:16, 60:3, 60:18, 61:7, 64:14
Daniel 18:19, 53:8
date 28:22, 51:4, 58:19, 58:20, 58:21
daughter 44:5
day 6:11, 8:9, 10:8, 16:3, 17:5, 18:2, 37:14, 54:17,

55:8, 67:2
Days 51:18, 51:23, 52:3, 52:5, 52:14, 61:13, 61:21, 64:21
December 30:22, 31:24, 33:12
decides 6:22
decision 22:2, 45:12
decline 22:5
declines 20:8
dedicated 37:5
deduct 55:15
deemed 62:14
default 4:12, 5:4, 7:7, 7:9, 7:10, 7:11, 8:6, 8:18, 11:5, 13:15, 14:7, 14:14, 15:20, 24:12, 62:13, 62:14
defaulted 64:3
defaults 17:23, 20:6
defend 20:14
DEFENDANT 2:3, 6:11, 14:15, 23:9, 25:22, 26:11, 50:13, 51:14, 57:23
Defendants 1:16, 3:22, 3:25, 4:9, 5:23, 7:6, 9:18, 10:10, 10:12, 11:3, 11:6, 11:12, 13:1, 14:6, 15:5, 17:22, 18:2, 20:4, 20:5, 21:22, 22:3, 22:15, 23:7, 26:24, 27:9, 27:13, 33:1, 41:17, 51:7, 51:19, 57:14, 57:24, 58:2, 60:11, 62:9,

63:18, 64:1, 64:3, 64:17
defense 23:5, 23:19, 60:11, 63:4
defenses 23:6
defer 4:17, 22:6
delay 7:17, 8:5, 15:11, 17:8, 21:21
demand 21:13, 21:16
Denied 11:5, 14:15, 15:4, 20:3, 66:32
denies 11:25
deny 6:1, 7:2, 58:2
depending 11:12
deposed 28:16
deposition 9:22, 30:14, 31:22, 33:12
deputy 8:20
describe 36:9
Description 66:32
desire 22:16
detail 61:3
determined 20:3
determining 7:8
develop 14:11
development 4:6, 20:9
device 40:24
different 29:11, 29:15, 29:21, 30:12, 32:11, 59:23
DIRECT 9:9, 25:12, 41:14, 43:25, 49:24, 66:8, 66:12, 66:16
directed 9:1
directly 28:2, 28:4, 28:5, 28:6
discharged 20:21
disclosed 23:15
disclosure 23:15

disclosures 23:16
discovery 57:11
discussed 49:3
discussion 8:4, 21:11
District 1:1, 1:2, 1:20, 8:10, 21:1, 21:2, 67:9
Division 1:3, 67:10
document 57:21
documentation 6:16
documents 31:11
doing 4:1, 43:1, 53:24
done 29:14, 35:2, 41:25, 57:2, 59:18, 62:25, 64:23
down 18:6, 25:5, 31:23, 33:12, 41:6, 49:14, 57:8
downstairs 6:18, 7:18, 8:16
drafting 6:16, 63:17
due 59:21
during 8:12, 20:9, 22:7, 27:1, 35:16, 36:7, 37:21, 41:21, 52:5, 53:10, 57:16

< E >
E-l-i-s-h-i-a 44:8
easily 64:24
East 38:9
edit 64:24
education 25:19, 50:5
effectively 21:21
efficient 16:20
either 9:9,

22:8, 24:2, 34:19
electronically 64:23
elementary 50:7
elements 61:5
eleventh 15:14, 22:3
Elias 3:22, 7:12, 12:14, 13:3, 27:16, 28:2, 28:8, 31:2, 31:7, 44:2, 56:11, 57:24, 62:16, 64:2
Elishia 44:1, 44:3
ELMO 47:2
em 42:24, 42:25
Email 1:30, 1:39, 2:9
employed 36:20, 37:22, 41:17, 43:8, 51:7, 51:20
employee 39:16, 39:18, 46:9, 50:19
employees 27:3, 27:5, 27:8, 33:3, 39:25, 42:18, 45:8, 46:3
employer 27:16, 27:18, 27:24, 28:2, 62:10
employment 39:9, 57:17, 58:19
En 66:34
encumber 16:22
End 8:17, 41:6, 61:19, 65:15
enough 9:13, 63:2
enter 14:14, 61:19, 64:16
entered 4:18, 7:7, 14:7, 20:6, 23:24, 24:10,

62:13
entering 11:5
Enterprises 3:7, 14:6, 21:8, 57:25, 62:12
entertain 16:14, 23:8
entire 17:7, 23:1, 51:7, 53:10, 57:16
entities 13:15
entitled 8:3, 21:17, 64:13, 66:41
entry 57:21
equals 64:10
essential 61:5
Essentially 16:12, 24:2
establish 16:4, 24:24
established 10:1, 24:12, 59:12, 60:15, 63:25, 64:2, 64:7, 64:10, 64:12
et 1:15
evening 52:11, 54:14
everybody 45:14
evidence 17:14, 58:5, 58:12, 59:12, 63:24, 64:5, 64:14
exact 36:12
exactly 29:23, 42:20, 44:12, 48:25
EXAMINATION 25:12, 41:14, 49:24, 66:8, 66:12, 66:16
example 9:10, 47:19
exception 23:1
excuse 7:14, 11:7
excused 15:1, 19:15, 19:21,

20:20, 21:12, 21:19, 21:23, 40:6
excusing 49:11
Exhibit 58:4, 58:6, 66:32
EXHIBITS 47:6, 58:9, 58:11, 64:5, 66:29
expect 4:4
expected 11:9
expecting 18:24
expense 17:1
explain 11:18, 30:1, 30:8, 30:11, 30:18
explained 12:17, 29:14, 29:17, 29:20, 30:4
extension 9:4

< F >
fact 27:16, 27:23, 61:1, 62:3
factors 11:13
facts 10:3, 10:4
factual 9:25
Failure 8:7, 10:7, 11:10, 22:12
Fair 9:13, 27:15, 28:1, 28:12, 38:12, 46:11
fairly 21:24
faith 60:10
fall 6:23, 8:14
far 9:12, 12:18, 12:19, 23:4, 29:23, 37:24, 38:5, 38:8, 38:14, 40:12, 42:2, 45:3, 58:23, 59:20, 60:3, 62:12, 62:16
fast 62:24
favorable 63:3

fax 42:25
federal 17:1
fee 59:16, 60:25
feel 17:10
feels 20:10
fees 7:11, 11:8,
23:2, 59:14,
60:22, 64:19,
66:42
felt 14:22
few 7:3, 38:11
figure 59:4,
59:23
filed 5:22,
21:13, 45:2,
45:6, 45:13,
57:21, 59:1
filing 64:9
find 5:11, 9:8,
9:11, 11:6,
44:17
finding 60:17
findings 17:24,
61:1, 61:6,
62:3, 63:11,
64:22
finds 59:11,
63:23
fine 17:19,
19:13, 58:22,
61:23
fire 6:22
Firm 2:4
first 18:4,
19:24, 22:19,
23:9, 24:16,
26:4, 26:10,
33:18, 37:24,
38:5, 38:20,
44:6, 50:6,
50:12
Fitzwater 1:19,
21:3, 64:23
five 52:3, 52:14
FLSA 16:5,
58:14, 63:2
follow-up 13:11
following 11:4
foregoing 66:39,
66:40

form 47:11
formal 5:21
format 66:42
forward 8:20,
14:2, 17:19
found 5:19,
59:20
Four 4:9, 7:6,
22:14, 36:8,
36:19, 41:18,
41:19, 41:25,
45:17, 53:2,
63:18, 64:1,
64:17
fourth 38:7
free 40:11,
40:21
Freeway 1:27,
1:35
front 32:3
full 16:2, 23:14
full-time 26:23,
50:19
function 42:20


< G >
Garcia 1:5, 21:7
Gary 46:19
gather 19:10,
52:18
gathered 42:23
gave 28:23,
30:16, 39:19,
62:23
general 26:15,
58:1
generate 48:2,
48:9
give 6:21, 9:2,
9:4, 19:9,
28:17, 39:22
given 6:7, 27:4,
27:8, 30:2, 65:7
giving 23:8,
41:8
God 21:4
government 17:1
governs 23:25
grade 25:20,

50:6
grant 4:15
granted 64:20
grass 36:5,
36:22
guess 9:14


< H >
hall 19:17
hallway 5:7
hand 24:19
handle 16:20
handled 29:22
handling 29:12
handwritten 48:8
happened 35:10,
39:6, 46:11
HARRISON 1:25
hear 13:14,
15:21, 32:23,
65:9
hearsay 17:16
helpful 60:24,
61:22, 62:8,
63:12
helps 6:2
hired 26:13,
27:6, 34:2
holding 26:23
Honor 3:12,
3:17, 4:24, 5:4,
7:15, 8:14,
9:20, 9:23,
10:22, 12:23,
13:11, 15:25,
18:24
Honorable 1:19,
21:2, 21:5
hour 15:14,
22:3, 45:13,
51:6, 51:9,
55:10, 55:15,
56:1
hourly 45:16,
45:23, 46:3,
46:8
hours 31:3,
31:8, 31:12,
31:16, 31:19,

31:20, 31:25,
33:7, 33:8,
33:14, 33:17,
33:18, 34:7,
39:1, 39:12,
42:24, 43:11,
43:14, 45:5,
45:11, 47:16,
47:21, 50:22,
50:23, 51:12,
51:15, 55:13,
55:25


< I >
idea 7:17,
18:11, 36:11,
36:12, 47:18
Identified 66:32
identify 58:6
immediately
3:23, 19:18
implement 46:17
impossible 21:24
included 32:15
including 64:5
increased 39:2
incur 16:25
INDEX 66:1
indicated 20:16,
22:9
indicating 43:10
individual 15:8,
16:5, 22:23,
63:3, 63:12,
64:2
individually
8:2, 58:7
individuals
27:12
indulgence 5:6
inform 3:24, 4:3
information 4:2,
6:2
initial 23:16
inquire 43:13
instead 61:21
instructed 3:24,
4:1, 11:1
intend 15:9

intended 6:24
intention 15:18, 61:18
INTERPRETER QUILLIAN 25:6, 26:7, 31:4, 36:23, 52:21
interpreting 26:8
interrogatory 23:17
invited 65:8
issue 11:8
issues 11:7
it. 33:21
itself 63:2


< J >
J. 2:40, 66:39, 67:6, 67:7
JAMIE 1:25
January 36:2, 51:3, 55:24
Jay 5:15
jeopardize 44:22
Jess 3:6, 14:6, 21:8, 57:25, 62:12
job 41:21, 44:23, 53:14
jobs 37:1
joint 24:7, 64:16
jointly 63:19
Jonathan 18:19
JUDGE 1:20, 5:18, 17:18, 19:13, 24:15, 25:1, 35:21, 41:13, 46:22, 47:2, 57:10, 59:7, 61:24, 65:4, 65:11
judgment 4:13, 61:19, 63:18, 64:16
judgments 7:7, 11:6, 13:15, 14:7, 14:14

Judicial 8:10, 66:43
jurisdiction 58:13
jurors 17:5
jury 3:9, 6:18, 6:19, 8:16, 8:17, 16:12, 16:16, 16:21, 16:22, 16:25, 17:8, 17:9, 21:10, 21:13, 21:14, 21:16, 21:17, 21:24, 22:6, 22:11, 22:16


< K >
keys 39:19, 39:22, 40:1
kind 10:4, 61:3
knowledge 8:11, 8:12, 55:20
known 7:12, 12:6, 12:9, 20:14, 37:17, 61:15


< L >
Lacey 46:19
lack 8:1
language 65:7
lapse 18:7
Last 3:21, 6:12, 6:15, 6:21, 13:2, 15:25, 30:23, 31:23, 33:12, 35:5, 35:9, 35:12, 41:10, 41:25, 55:9, 55:23, 56:2, 58:18, 58:20
lastly 11:9
Late 3:21
Lately 28:13
later 63:15
latter 22:24

Law 2:4, 7:6, 15:6, 61:2, 62:2, 62:17, 62:19, 63:6
lawsuit 45:2, 45:6, 45:13, 59:1
lawyer 14:8, 20:15
lay 52:23
LBJ 1:27, 1:35
leaking 52:25
least 56:2
leave 40:14, 40:17, 49:15, 50:25, 54:19, 54:21
lectern 3:19, 10:21, 15:1
LEE 1:33
left 27:6, 27:7, 46:1, 46:6, 46:12, 54:23, 55:24
Lemo 19:2
level 25:19, 50:5
liability 7:10, 11:7, 16:5, 22:23, 61:5, 63:3, 63:12, 64:2, 64:4, 64:5, 64:17
liable 62:14, 63:19
light 18:5, 21:11, 63:3, 64:14
likely 24:10
limitations 23:5, 23:20
limited 7:12
Line 29:2, 31:23, 33:12, 66:4, 66:21
lines 30:14
liquidated 59:15, 60:3, 60:18, 61:7, 64:14

list 18:10
literally 15:13
litigants 3:5
little 9:1, 19:12, 25:10, 37:5, 54:12, 54:18, 54:20
LLC 1:15, 3:7, 21:8, 57:25, 58:1
located 37:7, 37:9, 38:11
location 37:17
logistical 19:8
logistics 8:20
long 7:17, 26:16, 41:16, 42:19, 45:7, 45:8, 50:18, 55:9
look 10:1, 10:3, 23:24, 39:14, 47:14
looked 43:4
looking 4:12, 24:12, 61:4, 61:13
lot 43:11
LP 58:1
lunch 55:7, 55:15, 55:21


< M >
Ma'am 49:14
machine 35:3
magnitude 36:9
mainly 39:11
maintaining 32:12
maintenance 26:15, 26:17, 26:21, 27:3, 27:9, 29:12, 34:18, 39:22, 51:13, 53:1
majority 37:1, 43:10
man 51:13
management

44:15, 55:12
manager 27:22,
46:19, 57:24
managers 28:14
Manteuffel 1:33,
3:10, 5:16,
59:18
manually 35:3
mark 54:9
marking 46:2
masse 66:34
masse58 66:34
matter 3:6,
5:12, 6:11,
21:7, 21:10,
66:41
matters 9:25,
11:19
mean 23:7,
35:11, 42:15,
46:1, 49:3,
61:2, 62:16
meaning 34:18
mechanical 2:47
mediation 8:9
meet 35:13
memorandum 62:19
mention 7:25
mentioned 6:24,
19:16, 37:25
Mexico 25:16,
50:2
microphone 25:5,
25:9, 41:5
middle 5:2
mind 8:21, 14:2
minute 4:4,
6:12, 6:21, 8:20
minutes 7:3,
7:22, 9:2, 11:2
misunderstanding
12:8
moment 4:19,
35:21, 40:9,
46:22, 56:8
Monday 6:25
monetary 11:11
money 17:1,
29:23
month 42:16,

50:22, 51:2
months 20:13
morning 3:5,
3:12, 3:20,
5:16, 5:20,
8:11, 11:10,
21:15, 22:7,
37:3, 52:10,
52:17, 54:13
motion 5:18,
5:21, 14:15,
15:4, 59:15,
59:17
motions 16:19
move 7:1, 58:4
MR. CARSE 3:12,
3:17, 3:20,
4:11, 4:16,
4:21, 4:24,
5:13, 7:15,
7:23, 8:8, 8:23,
9:5, 9:13,
10:13, 10:22,
10:25, 12:3,
12:8, 12:23,
13:11, 13:14,
13:25, 14:3,
14:12, 14:19,
14:23, 15:1,
15:3, 18:24,
19:17, 19:22
multiweek 6:25
myself 13:21


< N >
Name 5:15,
37:18, 41:8,
41:11, 44:7,
53:6, 54:20,
66:4
named 25:23
names 37:20
natural 8:2,
15:5, 20:5
necessarily
30:13
necessity 20:14
need 3:8, 6:23,
7:1, 7:17, 7:23,

8:17, 10:1,
16:4, 16:22,
18:1, 18:12,
18:14, 19:12,
19:20, 24:24,
30:19, 58:7,
61:2, 61:12,
61:14, 63:7
needed 12:14,
18:20, 29:14,
29:17, 30:5,
30:11, 53:18,
57:2, 61:6,
62:25
needs 18:6,
19:18, 31:4
new 4:1
next 6:25, 41:1,
49:19
night 3:21,
13:2, 35:9,
52:17
No. 19:13, 26:6,
26:7, 28:19,
33:15, 34:11,
34:16, 34:20,
35:8, 36:15,
38:25, 43:6,
43:17, 44:21,
44:25, 45:5,
45:15, 45:18,
45:22, 48:7,
48:20, 50:9,
50:11, 53:5,
54:6, 54:8,
54:22, 55:22,
57:3, 60:1
Nobody 45:5,
45:7
none 34:17,
34:18
nonjury 22:14,
61:3
normal 52:12
normally 52:9
North 37:12,
37:19
Northern 1:2,
21:1, 67:9
note 3:10, 8:8

notebook 58:4
Nothing 14:23,
40:11, 65:3
noticed 45:8
number 31:23,
57:15, 57:21,
57:23, 58:3
numbers 58:6
nutshell 62:20


< O >
o'clock 19:24,
20:16, 20:19
oath 28:23,
30:16, 30:22,
31:24, 33:22
object 17:16
objection 12:21,
12:23, 49:11,
49:13
objections 17:14
obviously 17:12
occurred 15:13
odd 44:17
office 32:4,
37:8, 37:9,
42:6, 42:21,
42:25, 44:11,
48:22, 54:11
OFFICER 3:3,
7:20, 10:16,
10:19, 20:22,
20:25, 65:14
Official 67:8
often 42:10,
53:13, 53:17,
55:4
old 25:17,
25:18, 50:3
Once 48:2, 55:8
One 13:11,
17:16, 22:22,
27:11, 30:5,
31:9, 31:11,
31:13, 32:4,
36:11, 37:24,
38:3, 38:7,
38:8, 40:9,
47:14, 54:1,

55:10, 55:14, 56:24, 62:7
ones 39:24, 40:2
opening 22:20
oppose 5:18, 5:24
order 15:22, 18:17, 23:24, 23:25, 24:1, 24:7, 24:10, 25:25, 54:25, 58:19
orders 64:23
originally 25:16
others 1:6, 3:7, 34:7
otherwise 8:11, 60:11
outside 7:4, 37:8
overtime 7:9, 33:2, 33:5, 33:6, 33:10, 33:14, 33:17, 34:3, 34:6, 34:7, 34:14, 34:19, 38:15, 38:22, 39:4, 43:11, 43:14, 43:20, 44:23, 45:4, 45:9, 47:19, 48:12, 48:19, 48:21, 55:13, 57:16, 59:21, 63:25, 64:10
own 21:21, 44:22
owner 27:21, 44:5, 56:16, 56:22

< P >
Page 24:8, 29:1, 29:2, 30:14, 31:23, 33:12, 66:4, 66:21
paid 33:1, 33:10, 33:14, 33:17, 34:19,

45:10, 47:18, 47:20, 47:24, 51:6, 55:1, 57:15
paint 36:22
pam_wilson@txnd. uscourts.gov 2:44
PAMELA 2:40, 66:39, 67:7
panel 6:18, 7:4, 7:18, 8:16, 9:11, 17:7, 21:14, 22:1
papers 23:2
Paragraph 57:23, 58:2
parameters 9:6
Park 37:19, 37:23, 38:4, 38:9
part 16:20, 51:19, 54:3
participation 16:13, 21:25
particular 5:24, 16:6, 17:10, 47:16
parties 15:15, 58:14
partner 58:1
party 11:15
past 8:5, 11:2, 20:16
patios 36:4, 36:21
Pause. 4:23, 8:24, 35:23, 40:10, 47:1
pay 33:5, 33:6, 38:15, 38:22, 43:20, 45:13, 45:14, 48:18, 48:23, 49:5, 55:16, 55:20
paying 17:4, 34:6, 34:14, 43:14, 44:23, 45:3, 48:21, 55:12

payment 31:9
payments 31:14, 32:10, 32:11, 33:9, 63:1
payments. 32:5
payroll 41:23, 42:4, 42:12, 42:17
PC 1:26, 1:34
PEDRO 1:5, 21:7, 49:21, 66:14
pendency 35:16
people 30:4, 30:11, 30:18, 31:3, 31:8, 31:16, 31:25, 33:2, 53:1
Per 51:6, 51:9, 51:16, 51:17, 51:25, 52:14
perhaps 16:15, 16:17, 16:19
period 27:2, 27:4, 36:7, 41:21, 47:10, 47:15, 48:23, 51:7, 51:14, 52:6, 53:11, 57:17, 58:18, 59:5, 64:8, 64:21
permit 3:25
permitted 11:20, 40:17
person 8:2, 18:20, 20:5, 44:14, 44:15
personnel 39:23
persons 15:6
phone 18:25, 53:19
physically 31:10, 53:23
pick 55:2, 60:15
place 23:23, 34:24, 62:10
PLAINTIFF 1:9, 1:25, 5:11, 5:16, 6:13, 9:15, 11:7,

15:16, 15:17, 15:24, 16:17, 16:21, 19:7, 20:9, 20:17, 21:13, 21:15, 22:10, 22:14, 22:16, 23:8, 23:18, 24:6, 49:20, 57:16, 58:11, 58:15, 59:21, 60:2, 62:7, 62:21, 63:4, 63:24, 64:4, 64:7, 64:18, 64:20, 66:21, 66:29
plan 9:7
pleadings 57:11
please 3:4, 3:21, 10:20, 10:25, 14:3, 21:6, 24:21, 31:5, 41:4, 49:23
pled 23:5, 23:6, 23:19
Plymouth 37:19, 37:23, 38:4, 38:9
point 9:7, 9:9, 27:6, 46:2
policies 45:3
policy 38:21
portions 57:20
position 5:11, 19:15, 26:17, 26:24, 41:21, 46:17, 60:4, 63:18
possible 23:18
possibly 10:10, 11:11
post-trial 16:19
postjudgment 60:22
posture 18:5
potential 5:4, 5:9
practicable 4:7
practical 17:17

pray 21:4
predicate 61:6
prejudice 15:17
prejudiced
15:24, 16:6,
20:10, 22:10
prejudices 20:17
prepare 35:13
prepared 5:20,
6:14, 6:15,
14:14, 15:15
prescribed 66:43
presence 11:23
present 3:10,
12:10, 15:9,
15:10, 15:12,
15:16, 15:21,
16:8, 20:14,
21:14
presentation
63:24
presented 62:6
presiding 21:3
pretrial 6:14,
6:24, 8:13,
10:8, 15:14,
16:1, 18:11,
23:24, 23:25,
24:1, 24:7,
24:10, 58:19
prior 21:11,
59:13, 64:8
privately 4:19
privilege 13:24
pro 4:10, 8:3,
8:7, 15:7, 15:8,
20:6, 21:17
probable 9:9
Probably 7:21,
18:1, 24:4,
24:12, 32:3
problem 9:16,
9:17, 9:19
Proceed 5:17,
6:6, 6:13, 12:2,
13:13, 14:22,
15:16, 15:18,
15:19, 16:7,
19:24, 21:15,
22:13, 25:8,

40:25, 41:12,
57:12
proceeding
15:11, 15:24,
19:15, 22:7,
40:16, 49:16
Proceedings
2:47, 10:18,
20:24, 65:10,
66:40
proceedings.
65:15
process 41:23
processed 42:4,
42:17, 48:6
processing 42:7
produced 2:48
progress 57:1
project 30:2,
30:19, 62:24
projector 47:9
projects 29:11,
29:15, 29:21,
30:5, 30:12,
31:3, 31:8,
31:17, 32:1,
34:5, 34:8,
39:20, 39:23
promoted 26:16
proof 17:21,
17:23, 60:16,
62:6
Properties 14:6,
26:19, 27:22,
28:14, 53:23,
56:13, 56:25,
58:1
property 56:21
proposed 61:2,
63:11, 64:22
protect 23:17
protecting 13:24
prove 17:11
prove-up 8:18,
63:3
provided 22:10
public 40:15,
49:16
pull 25:5
punch 37:4,

37:13, 52:9,
54:12
punched 35:3,
48:8, 54:2,
54:17
punishment 12:18
purportedly 35:1
purpose 16:23,
22:2
purposes 21:21
put 6:3, 19:10,
21:9, 23:10,
23:13, 24:9,
48:8, 54:21,
60:11, 61:25,
62:18, 63:4,
65:2
putting 47:9


< Q >
question 13:17,
13:19, 22:22,
23:11, 26:5,
29:2, 29:3,
30:9, 30:15,
30:17, 31:5,
33:16, 35:20,
39:15, 57:15,
58:18
questions 4:5,
44:20


< R >
Raise 24:19
range 58:8
rather 45:14
Raul 19:1
Rd 2:5
read 50:8,
57:10, 57:20
ready 5:21,
6:13, 6:18,
7:18, 15:16,
21:15
really 28:15,
33:21, 39:12,
46:7, 61:4
reason 6:10,

8:5, 15:10,
17:8, 22:4, 22:5
reasonable 9:4
reasonably 9:25
recall 46:7
receive 48:5,
48:7
received 4:2
Recess 10:15,
10:17, 19:9,
20:18, 20:23,
65:13
recite 59:22,
62:17
recognize 47:7,
47:11
reconsider 20:11
reconvene 9:1,
9:8, 19:24
record 6:4,
11:22, 14:11,
21:9, 21:10,
22:9, 23:11,
23:13, 23:23,
24:9, 24:22,
24:25, 57:11,
61:9, 62:1,
62:6, 62:10,
62:18, 63:8,
65:2, 65:5,
65:8, 66:40
recorded 35:1
recording 34:24
records 43:10
recover 64:14
recoverability
23:11
refer 48:1
referring 29:3
reflect 24:22,
65:5, 65:8
reflecting 45:9
regard 60:2
regarding 11:23,
21:10, 28:9,
34:13, 48:18,
63:12, 63:17
regular 34:3
rehires 9:10
relief 59:13,

59:18
relying 21:22,
62:9
remain 40:24,
65:6, 65:8, 65:9
remaining 58:2,
64:3
remember 9:21,
23:25, 28:16,
28:21, 28:22,
28:23, 29:2,
29:7, 30:15,
30:22, 31:22,
33:11, 33:22,
43:22, 44:12,
45:7, 46:5,
46:8, 46:13,
46:14, 46:16,
46:20, 50:15,
51:4
rep 35:17
repeated 31:5
report 28:4,
31:12, 47:9,
47:12, 47:25,
48:4
reported 2:47,
28:2
Reporter 2:40,
3:8, 41:8, 41:9,
67:8
reports 43:5,
47:23, 48:5,
48:9
represent 5:15,
8:1, 14:8, 15:7
representation
3:23
representative
3:13, 4:17,
4:25, 5:3, 7:5,
11:2, 25:22,
26:1, 34:12
representatives
5:1, 48:17
request 3:25,
5:6, 61:15,
61:16, 64:20
requested 40:16,
62:20

requesting 59:9
requests 57:14
required 36:18
requiring 34:3
respect 11:23
response 11:19,
13:21, 14:20,
57:19
Rests 58:15,
66:21
resumed 10:18,
20:24
retain 4:1
return 40:6,
40:14, 49:12
reveal 17:11
review 31:25,
56:25
reviewed 31:2,
31:7, 31:16,
31:19, 31:20
reviewing 31:11
rights 23:18
rise 3:3, 10:16,
10:19, 20:22,
20:25, 65:14
rlmanteuffel@sbc
global.net 1:39
RMR 2:40, 67:7
Road 37:12
ROBERT 1:33
Rodriguez 19:2
roofs 52:24
Room 2:41, 37:5,
37:7, 54:12


< S >
s/pamela 67:6
salary 45:10,
45:14, 46:15,
46:17
sanction 10:2
sanctions 11:11
save 21:4
saw 24:1
saying 24:2
says 57:23
schedule 18:3,
52:12, 61:14

scheduled 22:13
school 50:7
se 8:3, 8:7,
15:8, 20:6,
21:17
se. 4:10, 15:7
seat 5:2, 8:22,
40:21
seated 3:4,
5:13, 6:5,
10:20, 21:6,
24:21, 41:4,
41:5, 49:23
second 17:5,
18:1, 40:9
secretary 19:16
SECURITY 3:3,
3:14, 7:20,
10:16, 10:19,
20:22, 20:25,
65:14
seeking 59:25
seen 5:21, 43:7
SEJ 14:6, 58:1
select 16:12,
21:24, 39:24
selection 3:9,
6:19, 17:8, 22:6
send 9:3, 42:7,
42:23, 49:4
sense 17:12
sent 5:22,
31:21, 33:8,
48:6, 48:14
separately 59:14
September 26:12
serve 10:2
served 57:14
servicing 53:2
session 21:2
set 20:13
settled 15:6
seven 52:14
seven. 51:22
several 20:13,
37:1, 64:16
severally 63:19
Shakrian 7:12
share 6:3
shopping 29:15,

29:21, 30:5,
32:12, 33:2,
34:15, 36:6,
36:10, 36:14,
36:19, 37:10,
37:17, 37:20,
45:17, 46:4,
51:14, 53:2,
53:7
show 47:6
shown 64:4
shows 47:15
side 29:12
sidewalks 36:25,
52:20
Sidney 1:19,
21:2
sign 54:5, 54:7
signed 5:22,
31:12, 31:19,
54:4
signing 54:1
similarly 1:6
simply 6:11, 7:8
simultaneously
26:8
sir 5:2, 10:5,
13:9, 14:9,
22:18, 25:6,
25:8, 25:11,
40:13, 40:22,
46:21, 57:7,
59:3, 60:8,
60:20, 60:23,
63:20, 63:22
sit 26:24
situated 1:6
situation 8:6,
24:12
six 51:21, 52:14
Six. 27:10, 52:7
size 36:10,
36:13
slot 54:20
Somebody 43:23,
44:16, 44:25
someone 40:16
sometime 39:6,
46:6, 46:11
Sometimes 43:12,

51: 21
somewhere 24: 1, 46: 1
soon 4: 2, 4: 7, 4: 8
sorry 14: 25, 26: 4, 30: 7, 30: 10
sort 10: 2, 23: 12, 63: 13
South 37: 23
Spanish 65: 7
speaking 57: 1
speed 18: 1
spell 41: 8
spells 44: 6
spend 31: 25
spent 31: 3, 31: 8, 31: 16
spoke 29: 11, 35: 6
spoken 28: 11
stand 9: 8, 10: 15, 20: 18, 24: 18, 60: 14, 65: 13
standpoint 17: 17, 19: 8
stands 7: 14, 36: 23
started 23: 9, 26: 4, 26: 10, 27: 19, 33: 13, 33: 18, 34: 3, 38: 18, 38: 21, 39: 4, 43: 17, 44: 10, 44: 13, 46: 7, 46: 14, 50: 12, 50: 15, 50: 21
starting 6: 25
state 22: 9, 62: 6, 62: 8
stated 57: 17
statement 22: 20, 24: 6, 46: 16
States 1: 1, 1: 20, 21: 1, 21: 4, 67: 1
stating 30: 22,

33: 22
status 7: 13, 8: 6, 10: 23
statute 23: 5, 23: 20
stay 8: 16, 40: 15, 40: 16, 40: 17, 40: 20, 49: 16, 49: 17
staying 40: 23
stenography 2: 47
step 5: 7, 7: 4, 19: 17, 49: 14, 57: 8
stick 60: 2
stipulated 58: 14
stipulates 58: 20
stopped 36: 2, 46: 3, 54: 14
stores 36: 11, 36: 13
Story 37: 12
straight 47: 20, 47: 21, 47: 24
Street 2: 41, 38: 2, 38: 6, 38: 10
subject 10: 9, 11: 11
submission 23: 12, 64: 21, 64: 23
submit 59: 16, 61: 3, 64: 22
submitted 23: 2, 59: 14, 60: 25, 61: 1
sufficient 9: 2, 22: 5
suit 64: 9
Suite 1: 27, 1: 36, 2: 6, 37: 12
sum 64: 15
summation 59: 20
summoned 22: 1
superior 44: 25
supervise 35: 25, 36: 3
supervised 27: 4, 27: 12, 37: 14

supervisor 26: 17, 26: 21, 27: 2, 27: 9, 32: 19, 34: 10, 43: 25, 53: 10, 62: 22
supports 60: 18
suppose 62: 7
suspect 24: 11
swore 28: 17
sworn 24: 19
sworn. 24: 20, 41: 3, 49: 22
sympathize 5: 23
system 6: 20, 17: 2, 34: 24


< T >
table 40: 22, 54: 18, 54: 21, 54: 23
talked 10: 8, 12: 13, 29: 4
telephone 5: 8, 53: 16
terminate 6: 22, 20: 15, 22: 3
terminated 3: 23, 8: 1, 12: 22, 12: 25
terminating 6: 12, 21: 22
termination 3: 24, 6: 8, 6: 9, 15: 13
terms 59: 13
testified 19: 20, 25: 25, 45: 19, 58: 18, 59: 5, 59: 24
testify 16: 8
testimony 16: 4, 16: 8, 23: 8, 23: 23, 24: 9, 28: 17, 28: 18, 28: 24, 32: 8, 42: 3, 60: 2, 60: 4, 63: 2
Texas 1: 2, 1: 12,

2: 42, 21: 2, 67: 9
themselves 15: 7, 59: 20
theory 62: 8
thereabout 52: 17
thinking 16: 11
thinks 30: 11, 30: 19
third 38: 3, 60: 16
thoroughly 16: 5
thoughts 19: 10
three 4: 10, 4: 25, 7: 6, 7: 8, 11: 5, 11: 19, 13: 15, 14: 6, 15: 5, 20: 5, 24: 2, 24: 13, 37: 20, 53: 4, 55: 23, 56: 2, 58: 23, 64: 3, 64: 8
three-year 23: 15, 59: 5
three. 4: 13, 20: 7
throughout 39: 8
throw 52: 20
today 8: 4, 8: 5, 8: 9, 8: 18, 12: 2, 12: 5, 12: 6, 12: 10, 12: 15, 12: 20, 16: 3, 16: 7, 16: 12, 20: 10, 21: 18, 21: 19, 21: 20, 21: 23, 21: 24, 22: 1, 22: 13, 26: 24, 29: 9, 30: 25, 32: 8, 33: 24, 35: 5, 43: 5, 43: 7, 60: 4, 61: 19, 62: 11
together 19: 10, 35: 14
TOM 2: 3
tom@carselaw.com 2: 9
tomorrow 10: 7,

11: 10,  12: 1,
12: 5,  12: 16,
15: 10,  15: 12,
16: 2,  16: 9,  20: 9
took 11: 1,  55: 21
top 54: 21,  54: 23
topic 13: 18
total  53: 4
TRANSCRIPT 1: 18,
2: 48,  66: 40,
66: 42
translation
40: 23
trash 52: 19
TRIAL 1: 18,  3: 1,
6: 13,  6: 14,
6: 17,  7: 11,  8: 7,
8: 17,  11: 24,
14: 8,  15: 15,
16: 3,  16: 16,
16: 21,  16: 25,
20: 8,  20: 12,
21: 18,  21: 19,
21: 20,  21: 21,
21: 23,  22: 11,
22: 13,  22: 14,
22: 23,  23: 1,
42: 3,  61: 3
true 25: 21,
31: 2,  31: 7,
33: 1,  33: 4,
34: 17,  38: 14,
39: 16,  46: 16,
47: 22
trusted 39: 16,
39: 19,  39: 24,
40: 2
truthful  28: 17
try 6: 23,  7: 1
trying 9: 21,
17: 12,  18: 3,
23: 25
Tuesday 8: 11,
22: 6,  22: 8
turn 11: 3,
11: 14,  42: 6,
49: 1
turned 42: 10
two 24: 2,  26: 18,
38: 5,  53: 3,

53: 5,  62: 9
TX 1: 28,  1: 37,
2: 7
type 47: 11,
47: 25,  63: 11


< U >
Um-hum 41: 20
unavailable 8: 4
understand
10: 13,  42: 2
understanding
16: 2
understands
4: 14,  15: 15,
19: 20
understood 12: 5,
12: 19,  13: 19,
27: 20
undo 7: 16
United 1: 1,
1: 20,  21: 1,
21: 4,  67: 1
Unless 15: 17,
20: 9,  20: 16,
32: 23,  59: 23,
59: 24
unpaid 7: 9,
63: 25,  64: 10
Until 10: 15,
12: 1,  12: 16,
15: 10,  15: 12,
18: 4,  19: 9,
19: 20,  20: 9,
20: 18,  22: 6,
50: 20,  50: 24,
52: 10,  52: 17,
55: 24
untimely 4: 6
upstairs 6: 19
using 46: 2,
58: 21


< V >
valid 6: 9
vast 43: 10
VERSUS 1: 12,
3: 6,  21: 8

VILLANUEVA 66: 6
Villenueva 3: 14,
4: 24,  5: 7,
11: 14,  11: 17,
12: 9,  12: 11,
12: 22,  12: 24,
13: 6,  13: 14,
13: 17,  13: 22,
14: 1,  14: 4,
14: 13,  18: 14,
19: 6,  19: 19,
24: 16,  24: 17,
25: 14,  42: 2,
42: 4,  42: 22,
45: 19,  53: 12,
55: 2,  63: 1,  65: 6
violation 59: 8,
59: 12,  60: 7,
60: 17,  64: 7,
64: 12
visit 11: 2,
56: 13


< W >
wages 43: 14,
57: 16,  62: 15
wait 12: 1
waive 16: 21,
21: 15,  22: 16
waived 22: 12
waiver 22: 11
waiving 16: 16,
16: 25
wanted 4: 6,
13: 16,  23: 14,
63: 7
wants 32: 23,
52: 21,  59: 19,
62: 17,  63: 5
wash 36: 22,
36: 25
waste 17: 2,  22: 1
watch 49: 17
Wednesday 6: 15
week 6: 21,  7: 1,
15: 25,  33: 7,
33: 15,  33: 18,
35: 12,  43: 11,
47: 15,  47: 16,

47: 19,  50: 22,
51: 12,  51: 16,
51: 17,  51: 18,
51: 25,  52: 5,
52: 14,  55: 13,
55: 25
weekend 55: 5
weekly 42: 13,
53: 20
weeks 52: 2
welcome 40: 15,
40: 17,  49: 16
well-settled 7: 5
West 38: 4
whatsoever 18: 7
Whenever 49: 1
whether 10: 11,
11: 24,  12: 22,
12: 24,  16: 11,
17: 12,  17: 17,
23: 24,  23: 25,
46: 8
whim 6: 10
Whoever 44: 14
whole 46: 14
whom 4: 10,  14: 7
Will 5: 10,  6: 4,
7: 3,  7: 17,  11: 5,
19: 13,  20: 11,
20: 18,  22: 9,
22: 10,  22: 11,
22: 13,  24: 22,
41: 1,  61: 11,
62: 22,  63: 5,
64: 16,  64: 21,
65: 13
willful  59: 8,
59: 12,  60: 6,
60: 16,  60: 17,
61: 6,  64: 7,
64: 12
willfulness
7: 10,  11: 7,
24: 11
WILSON 2: 40,
66: 39,  67: 6,
67: 7
windows 52: 20
wish 40: 14,
40: 18,  49: 15

wishes 3:15, 12:12, 17:20
withdraw 35:19
within 16:18, 38:11, 61:13
without 16:13, 21:20, 21:25
Witness 9:16, 12:13, 13:2, 13:7, 13:10, 14:9, 14:17, 14:21, 14:25, 18:2, 19:25, 22:20, 24:16, 24:18, 24:20, 26:5, 40:5, 40:6, 40:19, 41:1, 41:3, 41:7, 41:10, 44:8, 49:9, 49:18, 49:19, 49:22, 51:10, 58:18, 66:4
witnesses 5:21, 15:21, 15:22, 18:11, 18:12, 19:4, 57:9
wondering 17:17
word 9:3, 12:18
words 59:24
work 9:5, 28:6, 28:9, 28:12, 29:17, 30:5, 30:12, 30:19, 34:3, 34:25, 35:7, 36:6, 40:7, 40:12, 40:15, 45:11, 45:23, 46:4, 47:16, 47:19, 49:12, 50:18, 50:24, 57:2, 62:21, 62:24
Work. 29:6
workday 52:8
worked 27:12, 32:18, 33:14, 33:18, 36:19, 37:14, 37:21, 39:1, 39:11,

39:20, 39:23, 42:5, 43:1, 45:7, 47:15, 50:21, 51:13, 51:21, 52:3, 54:10, 55:13, 55:18, 55:23, 56:3
workers 32:11, 33:6, 34:14, 34:18, 42:5, 42:23, 44:24, 45:3, 45:16, 45:23
working 23:9, 26:4, 26:11, 26:14, 27:19, 30:2, 31:3, 31:8, 31:17, 32:1, 32:11, 33:3, 33:7, 33:13, 33:18, 34:7, 34:14, 34:25, 36:2, 38:18, 38:21, 39:4, 42:19, 43:11, 43:17, 44:10, 44:13, 48:12, 50:13, 50:16, 50:22, 51:18, 52:12, 53:1, 54:14, 55:6, 55:11, 56:1, 56:14
works 45:5
write 50:10


< Y >
yard 52:19
year 26:20, 30:23, 39:6, 50:24, 60:16
years 24:2, 24:3, 24:13, 25:18, 26:18, 27:24, 28:3, 32:17, 41:18, 41:19, 41:25, 55:18, 55:23,

56:2, 58:24, 64:8
Yes. 30:21


< Z >
zabogado@aol.com 1:30
ZIDELL 1:25, 1:26, 1:34, 3:10, 5:15, 15:23, 22:16, 24:23, 25:9, 62:1, 66:8, 66:12, 66:16
ZIDELL25 66:8
ZIDELL41 66:12
ZIDELL49 66:16

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 14th day of November, 2013.


                              s/Pamela J. Wilson
                              PAMELA J. WILSON, RMR, CRR
                              Official Court Reporter
                              The Northern District of Texas
                              Dallas Division